[No. B139930. Second Dist., Div. Six. May 28, 2002.]

TRACK MORTGAGE GROUP, INC., Plaintiff and Appellant, v. CRUSADER INSURANCE COMPANY, Defendant and Appellant.

858

## COUNSEL

Doss & Page, Dennis H. Doss and Daniel Nassie for Plaintiff and Appellant.

Gerald Philip Peters; Snyder, Dorenfeld & Tennenbaum and David K. Dorenfeld for Defendants and Appellants.

## OPINION

**GILBERT, P. J.**—A lender holds a first deed of trust. The property suffers severe damage. The lender is named a loss payee on the debtor's property insurance policy. After the debtor defaults on its loan, the lender forecloses on the property and thereafter prevails in its action for breach of contract and bad faith against the insurance company.

The lender's contract damages are limited to the difference between the amount secured by the deed of trust and the amount of the lender's credit bid at the foreclosure sale (the credit bid rule). Here we hold the lender's tort damages are also limited by the credit bid rule absent a showing that the insurance company's conduct caused the lender to make the credit bid. The lender is entitled, however, to other consequential tort damages such as interest and attorneys' fees. We affirm.

### FACTS

Wolfriver Holding Corporation (Wolfriver) owned an apartment building in Los Angeles. Plaintiff Track Mortgage Group, Inc. (Track) held a first trust deed on the building. Crusader Insurance Company (Crusader) insured the building against physical loss or damage. Track was named a loss payee on the policy pursuant to a provision in the trust deed.

On July 18, 1996, J. Mandel Tencer inspected the building for Crusader. Tencer's report contains a lengthy checklist and a brief narrative. The checklist shows such items as floor covering, paint, plumbing and ceilings to be in "adequate" condition. The narrative states that the overall condition of the building is poor. The narrative cites such factors as broken and missing windows, opening in an electric panel, severely warped hallway floors at apartments 111 and 302, damaged first floor hallway ceiling and a hole in the third floor hallway wall. The narrative ends with the statement, "No other significant adverse conditions were observed except for graffiti on the rear exterior wall of the building."

At the end of July of 1996, members of the 18th Street gang moved into the building. One put a gun to the manager's head while other gang members kicked down doors, threw fire hoses on the floor and turned them on. Outsiders stole copper pipes leading to the toilets, causing plumbing leaks. Water from the fire hoses percolated through the building. The hardwood floors buckled, mold and mildew grew on the lower floors and fungus and mushrooms grew in some of the doorways. The building manager abandoned the premises.

Wolfriver reported the vandalism to Crusader on September 9, 1996. Wolfriver estimated that the damage had occurred sometime between August 20 and 27. Crusader retained County Line Claims Service (County Line) to investigate the loss. County Line reported that some of the damages appeared to be much older than the date of the loss.

On September 24, 1996, Wolfriver wrote to Crusader expressing the urgent need to act quickly on the claim. Crusader replied on October 23, 1996. Crusader's letter stated in part, "We are first beginning our investigation of this claim and insufficient information is available to determine whether coverage will be provided . . . ."

Wolfriver hired a public adjuster, Metropolitan Adjustment Bureau (Metropolitan). Clyde Welch of Metropolitan inspected the building on October 4, 1996. Crusader's vice-president and general counsel, Roger Platten, and Crusader's adjuster, Jeff Queen, joined Welch on the inspection tour. Platten took notes.

Welch testified that during the inspection Platten and Queen were agreeing on what was not covered by the policy. Welch tried to get them to discuss what was covered, but was unsuccessful. He said he asked Platten questions but never received an answer. It was apparent to Welch that Platten and Queen were looking at damages that were either marginal or

obviously not covered by the policy. Platten admitted at trial that nothing in the notes he took that day indicated there might be some coverage.

After the inspection Wolfriver's adjuster, Welch, made an appointment with Crusader's adjuster, Queen, to determine the scope of repairs. Queen cancelled the appointment and never made another. Crusader never sent anyone to the building to determine the scope of loss.

In November of 1996, Track foreclosed on its mortgage. The indebtedness at the time of foreclosure was approximately $528,376. Track purchased the building at the foreclosure sale with a credit bid of $472,500. Ted Kolchier, Track's vice-president, testified that at the time of the foreclosure the property was worthless.

In May of 1997, Track's attorney requested a meeting with Platten. Platten refused to meet. Instead, Platten sent Track a letter stating in part, "Until we receive the list of tenants from November 1995 through October 10, 1996 with their addresses and terms of tenancy, together with a itemized list of what damages occurred on what dates, we can do nothing on this claim and a meeting would be useless."

Track's vice-president, Kolchier, testified he had no way of gathering the information; nor did Kolchier believe the information was available to anyone else. Track never submitted the information demanded by Platten.

In order to perform repairs, Track borrowed money secured by trust deeds on the building. It spent $1.2 million in repairs. Of that amount $877,935 was expended for damages covered under the policy.

Track brought its action against Crusader for breach of contract and breach of the covenant of good faith and fair dealing. Shortly prior to trial, Crusader paid Track $50,000 on the claim. Crusader did not require a release.

Boyd Veenstra testified as Track's expert. Veenstra opined that Crusader's handling of the property damage claim fell well below the standard for handling claims. He said Crusader failed in its duty to investigate. It did not determine the "scope of loss," that is, a list of what needs to be done to put the building back together. Crusader also failed to evaluate the claim objectively. It refused even to meet with Track to discuss the loss. Veenstra said an undisputed portion of the claim should have been paid long ago.

Veenstra also testified that the documentation Crusader requested of Track was unreasonable. It demanded a list of tenants and the specific dates on

which the damages occurred. Veenstra said it was unreasonable to expect a mortgagee to have or get such information. The custom and practice in the insurance industry when there is a disputed claim or the amount of loss is unknown is to furnish the insured with a form for the insured to make a sworn statement of loss. Crusader never did that.

The trial court found that Crusader breached its contract and the covenant of good faith and fair dealing. The court found that Track substantially performed its duties under the contract or was excused from performance by the unavailability of the information requested by Crusader.

The trial court found that Track expended $877,935 to repair damage covered under the policy. The court ruled, however, that the amount Track can recover under the policy is limited to the difference between the $528,376.75 obligation secured by the trust deed at the time of foreclosure and Track's $472,500 credit bid. The court calculated that amount to be $55,876.75, less the $50,000 paid by Crusader prior to trial, for a total of $5,876.75 due Track under the insurance policy. The trial court also awarded prejudgment interest.

As compensatory damages for breach of the covenant of good faith and fair dealing, the trial court awarded Track attorneys' fees and $52,876.57 for interest paid on the money it borrowed to fund the repairs. The trial court denied Track's request for punitive damages.

DISCUSSION

*Track's Appeal*

I

Track contends the trial court should have awarded the cost of repair notwithstanding the partial credit bid.

It is well settled that when a lender makes a full credit bid at the foreclosure of its mortgage, it is precluded for purposes of collecting its debt from later claiming that the property was actually worth less. (*Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1238 [44 Cal.Rptr.2d 352, 900 P.2d 601].) Under such circumstances, the lender is not entitled to insurance proceeds payable for prepurchase damage to the property. (*Ibid.*) This is because the lender's only interest in the property is the repayment of the debt. (*Id.* at pp. 1238-1239.) The lender's interest having been satisfied, any other payment would result in a double recovery. (*Ibid.*)

■ Track concedes that in the absence of tortious conduct, these principles apply to limit the lender's recovery even when its credit bid is only for part of the total obligation. But Track distinguishes this case on the ground that here Crusader is liable in tort for breaching its covenant of good faith and fair dealing. (Citing *Gruenberg v. Aetna Ins. Co.* (1973) 9 Cal.3d 566, 575 [108 Cal.Rptr. 480, 510 P.2d 1032] [insurer who withholds payment of claim in bad faith is subject to tort liability].) Track relies on *Alliance Mortgage Co. v. Rothwell, supra,* 10 Cal.4th at page 1249 for the proposition that the measure of damages for tortious conduct is not limited to the extent to which a lender's security interest has been impaired. Instead, the tortfeasor is liable for all consequential damages. (*Ibid.*)

Of that proposition there can be no doubt. In fact, here the trial court awarded Track attorneys' fees and interest paid on funds borrowed to make repairs. These damages exceed recovery for the impairment of its security interest. But Track claims it is entitled to recover the entire $877,935 it expended in repairing damage covered under the policy.

Track's only interest in the property, however, is the repayment of the debt secured by its trust deed. (See *Alliance Mortgage Co. v. Rothwell, supra,* 10 Cal.4th at pp. 1238-1239.) Crusader's liability to indemnify Track for damage to the building could not exceed that amount. Track's argument is based on the theory that Wolfriver would have been entitled to recover the entire $877,935 from Crusader. But, unlike Track, Wolfriver's interest in the property was not limited to the amount of the secured debt.

Track posits that had Crusader fulfilled its obligation under the policy and promptly paid Wolfriver the $877,935, Wolfriver would have used the money to repair the building. Thus, Track concludes, its interest would have been secured by an additional $877,935. But even assuming that to be true, it would not increase Track's interest in the property. It would simply make Track's interest more secure.

The trial court correctly determined Crusader's liability to Track directly arising from the destruction of the building is limited to the amount of the debt. We must now decide the related issue whether Track's damages were further limited by its credit bid.

Track relies on *Alliance Mortgage Co. v. Rothwell, supra,* 10 Cal.4th 1226 for the proposition that the credit bid rule does not apply in tort actions against parties other than the borrower. But Track reads *Alliance* too broadly. There, a real estate lender brought an action against an appraiser and others alleging defendants fraudulently induced it to make loans by misrepresenting

the value of the properties. The trial court granted the defendants' motion for judgment on the pleadings on the ground that the lender's full credit bids at foreclosure sales barred its causes of action.

Our Supreme Court reversed and remanded stating: "[T]o the extent [the lender's] full credit bids were proximately caused by defendants' fraudulent misrepresentations, [the lender's] bids cannot be deemed an admission of the properties' value. [Citation.] Hence the full credit bid rule would not apply. [¶] In the alternative, to the extent [the lender's] full credit bids were not proximately caused by defendants' fraudulent misrepresentations, . . . the full credit bid rule applies, and [the lender's] bid would then constitute an irrevocable offer to purchase the property for that amount. [Citation.] Hence, under these circumstances, [the lender] would not be entitled to recover the difference between its bid . . . and the actual value of the property. [Citation.] It would, however, still be able to recover any other damages flowing from the defendants' fraud." (*Alliance Mortgage Co. v. Rothwell, supra,* 10 Cal.4th at pp. 1247-1248.)

*Alliance* makes it clear that unless Track can show Crusader's conduct caused Track's bid to be higher than the actual value of the property, Track's damages will be reduced by its credit bid. Track makes no such showing here.

Track's reliance on *Kolodge v. Boyd* (2001) 88 Cal.App.4th 349 [105 Cal.Rptr.2d 749] and *First Commercial Mortgage Co. v. Reece* (2001) 89 Cal.App.4th 731 [108 Cal.Rptr.2d 23] is also misplaced. Those cases stand for nothing more than that the full credit bid rule is inapplicable where the lender is fraudulently or negligently induced to make the bid. Here Track has not shown Crusader had anything to do with the amount of Track's bid.

Track claims that Crusader's insurance policy waives the credit bid rule. Track relies on the following policy provision:

"2. Mortgage Holders

"a. The terms 'mortgage holder' includes trustee.

"b. We will pay for covered loss or damage to buildings or structures to each mortgage holder shown in the Declarations in their order of precedence. As interests may appear.

"c. The mortgage holder has the right to receive loss payment even if the mortgage holder has started foreclosure or similar action on the building or structure."

But there is nothing in the policy language that could even remotely be construed as a waiver of the credit bid rule.

Finally, Track argues that policy considerations mandate an exception to the credit bid rule. Track's argument is based on the proposition that an insurer should not be rewarded for its bad faith. Of course, the proposition is true. But nothing about Crusader's bad faith induced Track to make such a high credit bid. If Track believed the property was worthless at the time of foreclosure, it could have bid a nominal amount and have held Crusader liable for the difference between the amount secured and the bid.

## II

Track contends the trial court erred in refusing to award all of the attorneys' fees it requested. Track requested $143,458 and the trial court awarded $80,000.

When an insurer withholds policy benefits in bad faith, its insured may recover attorneys' fees expended to enforce the policy. (*Brandt v. Superior Court* (1985) 37 Cal.3d 813, 817 [210 Cal.Rptr. 211, 693 P.2d 796].) The fees recoverable, however, may not exceed the amount attributable to obtaining benefits due under the contract. (*Id.* at p. 819.) Fees attributable to obtaining any portion of the award in excess of the amount due under the policy are not recoverable. (*Ibid.*) Thus the trial court here could only award fees expended in enforcing the policy, and not those expended in proving Crusader's bad faith.

According to Track's motion, the total expended on the case was $151,371. Of that amount, $143,458 was expended to compel payment of policy benefits. Track attached an itemized billing with those entries highlighted that it claims were not incurred in obtaining policy benefits.

Crusader opposed the motion on the ground that Track had not carried its burden to segregate the fees. Crusader claimed Track's billing system defeats its ability to determine which fees were expended in pursuit of policy benefits.

In limiting the award to $80,000, the trial court stated it recognized the "near impossibility" of segregating the billing item by item. The court concluded, "I will make an estimate and—a proportional estimate what the case is worth based upon the results, based upon the complexity of the case, based upon the experience of counsel, and having tried the case for, I believe, what, three or four weeks, and recognizing the issues and the sophistication that those issues demanded . . . ."

We must affirm the award in the absence of a showing of a clear abuse of discretion. (*Bihun v. AT&T Information Systems, Inc.* (1993) 13 Cal.App.4th 976, 997 [16 Cal.Rptr.2d 787].) Here the trial court that heard the case determined that $80,000 was a reasonable fee for enforcing the contract based upon the value and complexity of the case, the experience of counsel and the result. "The trial court is the best judge of the value of professional services rendered in its court . . . ." (*Akins v. Enterprise Rent-A-Car Co. of San Francisco* (2000) 79 Cal.App.4th 1127, 1134 [94 Cal.Rptr.2d 448].) The only proper basis for reversal of a fee award is an award so large or small that it shocks the conscience and suggests that passion or prejudice influenced the result. (*Ibid.*) Track has failed to carry its burden in showing an abuse of discretion.

Track's reliance on *Akins v. Enterprise Rent-A-Car Co. of San Francisco, supra,* 79 Cal.App.4th at page 1133 is misplaced. There, the court stated, "When the liability issues are so interrelated that it would have been impossible to separate them into claims for which attorney fees are properly awarded and claims for which they are not, then allocation is not required. [Citation.]" But *Akins* stands only for the proposition that no formal allocation of hours is required. Nothing in *Akins* prohibits the trial court from doing what it did here: allocating attorneys' fees based on its determination of the reasonable value of services attributed to the cause of action for which attorneys' fees are allowed.

## *Crusader's Appeal*

Most of Crusader's contentions concern whether the judgment is supported by the evidence. But our review of the evidence is limited. ██ "In viewing the evidence, we look only to the evidence supporting the prevailing party. [Citation.] We discard evidence unfavorable to the prevailing party as not having sufficient verity to be accepted by the trier of fact. [Citation.] Where the trial court or jury has drawn reasonable inferences from the evidence, we have no power to draw different inferences, even though different inferences may also be reasonable. [Citation.] The trier of fact is not required to believe even uncontradicted testimony. [Citation.]" (*Rodney F. v. Karen M.* (1998) 61 Cal.App.4th 233, 241 [71 Cal.Rptr.2d 399].)

## III

██ Crusader contends it is not liable for breach of contract because neither Wolfriver nor Track provided an inventory of the damaged property.

Crusader relies on a policy provision that an insured must, "at our request, give us complete inventories of damaged and undamaged property. Include

quantities, costs, values and amount of loss claimed." Crusader's vice-president and general counsel added to the requirement by demanding, not only an inventory of damaged property, but also a list of tenants from November of 1995 to October 10, 1996, and the specific dates on which the damages occurred.

Track's vice-president, Kolchier, testified Track did not have the information demanded by Crusader, nor could he obtain it. Track's expert testified it was unreasonable to expect a mortgagee to have or to obtain such information. The trial court found that Track was excused from performing by the unavailability of the information requested by Crusader.

An insurance policy must be interpreted in light of the " 'objectively reasonable expectations of the insured.' " (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1265 [10 Cal.Rptr.2d 538, 833 P.2d 545].) The objectively reasonable expectation of the insured is that the insurer would not insist on information the insured did not have and could not obtain. Instead, under such circumstances, the insurer would work with the insured in good faith to find some reasonable accommodation.

Here Crusader refused even to discuss the matter with Track. Moreover, Crusader had a detailed report on the condition of the property and existing damage made shortly before the vandalism. That report could have provided a foundation for creating an inventory of damaged property. The reasonable conclusion is that Crusader's demand for unavailable information was a ploy to avoid paying a legitimate claim.

The trial court did not err when it determined that Track's performance was excused and that Crusader breached the contract.

### IV

■ Crusader contends it is not liable for breach of contract because Track failed to segregate its costs to repair damage covered by the policy from costs to repair other damage.

But Crusader points to nothing in the policy that allows it to deny coverage for all damage simply because coverage for some of the damage might be in doubt. There can be no reasonable dispute that extensive damage occurred during the policy period. The vast difference in the condition of the building between Tencer's report of July 18, 1996, and the condition of the building after August 27, 1996, is evidence enough of that. Yet, Crusader refused even to discuss the matter with Track, and paid nothing on the policy

until shortly before trial. Track's expert stated the obvious when he testified that Crusader should have met with Track and paid for those items of damage that were obviously covered.

In any event, the trial court did not base its calculation of damages on Track's cost of repairs. It based its calculation of damages on the $55,876 difference between the amount secured by Track's mortgage and its credit bid. Given the extensive damage discovered after August 27, 1996, that was not included in Tencer's inspection report of July 18, 1996, there is no doubt Track was damaged in at least that amount. Crusader's payment of $50,000 shortly before trial confirms it. Track should have received payment long before it filed suit.

There is overwhelming evidence that Crusader breached its contract.

## V

■ Crusader contends it is not liable for bad faith. Crusader's contention is based on the theory that it did not have to pay policy benefits because Track failed to provide an inventory of damaged property and failed to segregate its damages. We have already disposed of the arguments on which Crusader's theory is based.

In any event, here there is substantial evidence of bad faith. "[A]n insurer must give at least as much consideration to the interests of the insured as it gives to its own interests." (*Frommoethelydo v. Fire Ins. Exchange* (1986) 42 Cal.3d 208, 214 [228 Cal.Rptr. 160, 721 P.2d 41].) An insurer cannot in good faith deny payments to its insured without fully investigating the grounds for its denial. (*Id.* at p. 215.) An insurer is liable in tort for bad faith when it unreasonably withholds payment of the claim. (*Id.* at pp. 214-215.)

Here, from the beginning Crusader's actions showed it was more interested in avoiding paying the claim than trying to make a fair settlement. Wolfriver's adjuster, Welch, complained he could not get Crusader's vice-president, Platten, or its adjuster, Queen, to discuss what might be covered. Queen cancelled an appointment to determine the scope of loss and never made another. Crusader never sent anyone to the building to determine the scope of loss. Crusader rebuffed Track's attempt even to discuss the matter. It made no payment to Track until shortly before trial. Crusader's actions were clearly not those of an insurer acting in good faith.

## VI

■ Crusader contends the trial court erred in awarding prejudgment interest. Its contention was based on the theory that the amount was not known or readily ascertainable.

Crusader argues the interest was awarded pursuant to Civil Code section 3287, subdivision (a). That subdivision provides for prejudgment interest on "damages certain, or capable of being made certain by calculation . . . ."

Track contends the court awarded prejudgment interest pursuant to Civil Code section 3287, subdivision (b). That subdivision vests the trial court with discretion to award prejudgment interest on unliquidated damages from a date no earlier than the date the action was filed. Track filed its action on June 27, 1997.

Under the contract portion of the court's statement of decision the court awarded interest from the date the sums were reasonably ascertainable, thus indicating the award was made under Civil Code section 3287, subdivision (a). The court set that date on May 27, 1999. Under the heading "Interest and Costs" in the statement of decision, the trial court awarded interest from the date the action was filed, citing Civil Code section 3287, subdivision (b).

The judgment itself awards interest on $55,876.76 from May 27, 1999. Crusader argues that shows the court awarded interest under Civil Code section 3287, subdivision (a).

But even if the court granted interest under Civil Code section 3287, subdivision (a), Crusader is wrong that the principal amount was not known. The trial court's award of interest was calculated on the $55,876.76 difference between the amount secured by Track's mortgage and its credit bid. This amount was known since November of 1996. There is no reason to reverse the trial court's award of interest.

## VII

Track requests attorneys' fees on appeal. Track is entitled to fees only to the extent Crusader's appeal attacked the judgment in favor of Track on the contract causes of action. (See *Brandt v. Superior Court, supra*, 37 Cal.3d at p. 817.) The amount of such fees is best determined by the trial court on remand. (See *Mackinder v. OSCA Development Co.* (1984) 151 Cal.App.3d 728, 739 [198 Cal.Rptr. 864].)

Track also requests sanctions for a frivolous appeal. But sanctions should be used to deter only the most egregious conduct. (*In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 651 [183 Cal.Rptr. 508, 646 P.2d 179].) This is not a case in which sanctions are appropriate.

The judgment is affirmed. Attorneys' fees on appeal to be determined by the trial court on remand. Other costs to be borne by each party.

Yegan, J., and Coffee, J., concurred.

On June 20, 2002, the opinion was modified to read as printed above. The petition of appellant Track Mortgage Group, Inc., for review by the Supreme Court was denied August 14, 2002.