[No. H029830. Sixth Dist. Sept. 4, 2007.]

JAMES H. BARON, as Receiver, etc., Plaintiff and Respondent, v. FIRE INSURANCE EXCHANGE, Defendant and Appellant.

## COUNSEL

Horvitz & Levy, Barry R. Levy, Andrea M. Gauthier; Hayes, Davis, Bonino, Ellingson, McLay & Scott, Mark G. Bonino and Maria S. Quintero for Defendent and Appellant.

Rossi, Hamerslough, Reischl & Chuck, Ronald R. Rossi, Susan R. Reischl and Samuel A. Chuck for Plaintiff and Respondent.

## OPINION

**ELIA, J.**—After a jury trial, appellant Fire Insurance Exchange (Fire) was found to have intentionally concealed and misrepresented an important fact and to have unreasonably failed to investigate and pay a claim covered under a fire insurance policy. On appeal, Fire contends that the judgment should be reversed because the appointment of respondent James H. Baron as receiver for the insured property was void or at least invalid for purposes of recovering punitive damages. Notwithstanding the righteous, histrionic tone of respondent's brief, we find no error in the trial court's judgment upholding the verdict.

### Background[1]

From 1992 to 2001 Dennis Sanfilippo and Carole Verni were engaged in a joint venture pertaining to property located on Big Talk Court in San Jose.

---

[1] The appellate briefs of both parties contain factual assertions with references to pages in the record that do not support their statements and, in respondent's brief, statements highlighted in boldface without any record references at all. The parties' carelessness amounts to a disregard of California Rules of Court, rule 8.204(a)(1)(C) and rule 8.204(a)(2)(C). We will disregard any factual references that violate these provisions. We cannot, however, ignore respondent's unprofessional tone, including rhetorical queries, a fawning portrayal of the arbitrator as a "practical, savvy former trial judge," and the suggestion that this court "should be similarly outraged" by Fire's conduct.

Under the terms of their written agreement, any disputes were to be settled by arbitration. In 2001 a dispute did arise, and in March they engaged an arbitrator, the Honorable Read Ambler (ret.).

On May 28, 2001, the property was extensively damaged by a fire. Verni was insured on the property under a Farmers Insurance Company policy provided by Fire.[2] Verni filed a claim, which was assigned to Gary Corbett, an independent adjuster. Independent adjusters handled claims when in-house adjusters were unavailable, but unlike the latter, independent adjusters had no authority to settle claims.

In July 2001 the arbitrator reached a decision in Sanfilippo's favor. In accordance with the parties' subsequent stipulation, he appointed respondent as receiver to take possession of the property, together with "any and all insurance proceeds relating to past, present, or future claims for damages to the [property] . . . including . . . those settlement proceeds in response to claims made against Farmers Insurance Exchange [*sic*] Policy No. 91261-54-57." The order also specifically authorized respondent to restore or sell the property and to "institute, prosecute, defend, compromise, intervene in or become a party to such suits, actions or proceedings as may in his reasonable judgment be necessary or proper for the protection, mainte-nance, operation, preservation or enhancement of the Receivership Estate, or the performance of his obligations pursuant to the terms of this Order . . . ." Respondent was to be compensated at an hourly rate.

In December 2001 Gregory Sterling, respondent's associate, wrote to Corbett advising him that respondent had been appointed as receiver to handle the insurance claim. Corbett appeared to welcome the appointment because he had been frustrated that the claim had not progressed. Corbett gave Sterling the names of two "approved contractors" for the purpose of repair, including Double R Construction. Corbett told Sterling that if he and respondent used an approved contractor, processing the claim would be "much smoother" and it would be easier to get "full value" for their insurance claim; but if they selected a contractor that was not on the approved list, it would be more difficult to give them "full value" for the claim.

Corbett affirmed his recommendation in a followup letter and advised respondent that he was forwarding respondent's contact information to

---

[2] Fire Insurance Exchange is an affiliate member of the Farmers Insurance Group of Companies.

Double R Construction. In a subsequent meeting at the property site, Corbett told Sterling that based on Farmers' experience, Double R would be a "very good choice." Sterling made it clear that he and respondent expected to pay for any improvements not covered by the policy, but Corbett suggested that some of those additions might be compensated if some covered repairs were not made. Corbett estimated the total cost of the repairs to be $200,000 or more. He represented to respondent and Sterling that he had "full authority to settle the claim, and that he was Farmers." He promised that he would take care of respondent on the claim "completely."

At trial Ron Iwasaki, Corbett's supervisor, testified, as did Suzanne Slater, a former manager of adjusters in the large-loss division, and Sharon Sims, a Northern California zone manager, that there had never been any list of approved contractors for large losses.[3] Both Iwasaki and Slater admitted that using the term "approved contractor" could mislead an insured into believing that the contractors had been screened by the insurer and that the insurer was guaranteeing the contractor's work.

Iwasaki understood that the property was under the management of a receiver and that all payments were to be made to that person. He testified that he treated respondent the same way he would have treated a homeowner. However, Iwasaki "probably" did not correct Corbett's misrepresentation to respondent that Double R Construction was on a list of approved contractors.

Based on Corbett's "very strong" recommendation and representation about the ease of reimbursement, respondent hired Double R Construction to perform the repairs on the property. Respondent notified Corbett that he intended to hire Double R since it was an approved contractor for Farmers. Respondent added that he expected the insurance proceeds to be "adequate to fully repair the home with the exception of the pool." Respondent asked Corbett to advise him if his understanding was incorrect; but he received no response to that effect. On March 4, 2002, Sterling wrote to Corbett, asking him to address specific coverage conditions and to verify that certain repair costs would be compensated. Corbett did not respond.

Farmers sent respondent a payment of $127,950.88, representing its estimate of the actual cash value of the loss. The company also paid for the removal of asbestos in the damaged house. Additional payments were expected once repairs were completed. Other work, such as city-mandated

---

[3] Real property losses exceeding $75,000 were handled by a separate department, the Large Loss Center of Excellence.

structural upgrades, became necessary, but when Sterling requested confirmation that the costs would be reimbursed, he received no response from anyone at Farmers.

Double R began demolition work in March or April of 2002. The repair did not progress expeditiously, however. By September both respondent and Sterling were "extremely worried." In mid-July respondent had already paid the contractor $63,361.44 of the amount he had received from Farmers. Around the beginning of October, Sterling expressed his concern to Corbett. He asked Corbett whether there was something he should know about Double R, but Corbett said he could not talk to Sterling about that. No one associated with Farmers informed respondent or Sterling that as early as June 2002 the company had been sending checks to Double R at an address in Arizona. Respondent and Sterling nevertheless decided that Double R had abandoned the job. Sterling called Corbett to obtain additional names from the "approved" list and thereafter solicited bids from other contractors. Eventually, respondent hired Sun Restoration, which completed the reconstruction of the home between January and June of 2003 at a cost of $258,528.75.

Meanwhile, on November 1, 2002, Sterling received a letter from Corbett stating that his office would "address" only "supplemental changes required by the Building Department and unit prices for existing line items. Demolition or construction initiated by the previous contractor which was not agreed to in writing by this office will not be addressed." According to respondent's expert at trial, this statement amounted to a denial of coverage.

Sterling was "totally confused and somewhat stunned" by this correspondence, as it was contrary to the promises Corbett had made regarding the process of reimbursement. Later that month he and respondent met with Corbett and another prospective contractor regarding an alternative bid. Corbett was angry about the extent of the demolition that had been done, such as the removal of the roof, even though his recommended contractor, Double R, had performed that work.

During this brief meeting respondent asked Corbett how Farmers was going to help recover the money Double R had taken. Corbett, however, got "very angry" and "pretty aggressive," insisting that there was "no way" Farmers would pay twice. When respondent suggested that perhaps he should talk to a lawyer, Corbett "blew up," announced that respondent would not be getting anything more out of him, and walked away.

Respondent initiated this action against Farmers, Corbett, and the Large Loss Center of Excellence on May 13, 2003, alleging breach of an insurance contract, bad faith refusal to pay policy benefits and damages caused by Double R, declaratory relief, negligence, fraudulent misrepresentation, and negligent misrepresentation. Fire's July 2003 demurrer to respondent's first amended complaint was sustained and its request to strike a request for punitive damages was granted with leave to amend.

The second amended complaint substituted Fire for Farmers. In the meantime, Sanfilippo filed a petition in superior court to confirm the arbitration award. Verni stipulated to such an order, which was granted by the court on August 22, 2003. The court confirmed not only the arbitrator's award but also his 2001 appointment of respondent as receiver.

In February 2005 respondent settled with Corbett for $60,000, and the matter proceeded to trial against Fire. In bifurcated proceedings the jury submitted a special verdict in respondent's favor on all issues. As to intentional misrepresentation and concealment, it found damages of $60,000. On the questions of breach of contractual duty to pay a covered claim, breach of the covenant of good faith and fair dealing by failing to pay policy benefits, and bad faith failure to investigate the claim, the jury determined the loss to be approximately $93,462. In the second phase of the proceeding, the jury determined that Fire, both independently and through approval or adoption of Corbett's conduct, had acted with malice, oppression or fraud. In accordance with the jury's verdict, the trial court entered judgment awarding respondent compensatory damages of $96,462[4] and punitive damages of $1.5 million. In an amended judgment, the court added attorney fees and costs, for a total award of $2,155,599.70.

### Discussion

1. *Respondent's Authority to Litigate as Receiver*

Fire's primary contention on appeal is that respondent had no authority to proceed in this action because the arbitrator had no jurisdiction to appoint

---

[4] This amount consists of $93,462 for insurance contract claims and $3,000 for fraudulent misrepresentation. The $63,000 fraud verdict was reduced by $60,000, the amount of the settlement with Corbett.

him as receiver. Because that appointment was "void for all purposes," Fire argues, he was "not the proper real party in interest" and therefore was not entitled to damages, attorney fees, or costs.

■ Code of Civil Procedure section 564[5] sets forth the conditions under which a receiver may be appointed. Subdivision (b)(1) of the statute permits an appointment "by the court in which an action or proceeding is pending, or by a judge thereof" in an action "between partners or others jointly owning or interested in any property . . . on the application of the plaintiff, or of any party whose right to or interest in the property . . . or the proceeds thereof, is probable, and where it is shown that the property . . . is in danger of being lost, removed, or materially injured." Subdivision (b)(9) broadly permits such appointments in any case in which a receiver is necessary "to preserve the property or rights of any party."

Fire contends, citing *Marsch v. Williams* (1994) 23 Cal.App.4th 238 [28 Cal.Rptr.2d 402], that any appointment made by an arbitrator is not specifically authorized by section 564 and therefore is void. In *Marsch*, as here, a partnership agreement provided for binding arbitration of disputes. The partners had a dispute that was submitted to arbitration, and the trial court subsequently confirmed the arbitration award. The appellate court reversed, holding that section 564 vested the power to appoint a receiver in the superior court and did not extend to arbitrators, even by agreement of the parties. (23 Cal.App.4th at pp. 245–248.)

Respondent correctly observes that the challenge to the appointment in *Marsch* was made by a party to the arbitration. He also points out that the appointment would be valid on remand if the trial court determined that an appointment would be warranted. In this case, respondent argues, Fire is not a party entitled to the benefit of the procedures for securing appointment of a receiver set forth in section 1281.8, subdivision (b). Respondent further insists that Sanfilippo and Verni properly applied for the appointment of respondent and thus substantially complied with the procedures outlined in section 1281.8, subdivision (b).

We need not reach these arguments because we agree with respondent's last point, that Fire's challenge to the appointment is precluded by its failure to attack it earlier. Had it done so and prevailed, respondent urges, he "would have saved in excess of $700,000 in attorney fees . . . [and] [t]he right to pursue the insurance benefits would have reverted to the insure[d], who could have timely pursued [Fire]." Because any action by the insured is now time-barred, respondent suggests, Fire would obtain a windfall by invalidating the appointment, thereby escaping payment of damages for its bad faith.

---

[5] All further statutory references are to the Code of Civil Procedure.

Respondent's position, though framed as one of "estoppel, ratification, and acquiescence" rather than waiver or forfeiture, has merit. (Cf. *Hise v. Superior Court* (1943) 21 Cal.2d 614, 622 [134 P.2d 748] [estoppel to deny validity of appointment, based on failure to make timely objection and affirmative acts recognizing authority of receiver].) While Fire did contest respondent's standing as a party to assert the first two contract-based causes of action and disputed his right to claim punitive damages, it did not seek dismissal of the lawsuit based on the invalidity of the receivership appointment. Addressing Fire's demurrer to the first amended complaint on September 16, 2003, the court recognized the "unusual" procedural posture of the case presented by the arbitrator's appointment. But the focus of the court at that point was whether the arbitrator had authorized respondent specifically to prosecute this lawsuit. Respondent's counsel noted that the appointment had been made a court order in August 2003 in the course of confirming the interim award. Counsel for Fire did not contest respondent's status as a duly appointed receiver; indeed, he conceded that the appointment order gave the receiver the authority to maintain contract-related causes of action arising out of the property itself. Instead, defense counsel's point was only that respondent was not authorized to pursue "personal tort causes of action" because they belonged exclusively to the insured.

In a motion to dismiss respondent as a party on October 28, 2005, Fire again challenged respondent's standing, arguing that "Baron, as a receiver, is a stranger to the insurance contract" and the insured had not made a valid assignment of her causes of action. The trial court, while acknowledging that this argument was "powerful and seductive," rejected it, affirming that respondent was proceeding "with prior court authorization" as receiver, and not as assignee or transferee.[6] The court also expressed the view that "the equities require recognition of the capacity of the receiver to proceed as previously authorized, because failure to do so, among other things, could lead to the parties to the arbitration being time barred from prosecuting claims—claims which they relied on the receiver to attend to within the scope of his court[-]conferred authority." In its answer to the second amended complaint (which was filed one week after the judicial order confirming respondent's authority to litigate), Fire asserted only that respondent lacked standing to sue because he was not an insured under the policy.

We thus conclude that Fire has forfeited its challenge to the validity of respondent's appointment by failing to raise it below. We further agree with the trial court that to deem the judicial appointment invalid merely because it occurred through the ratification of the arbitrator's act would effect an

---

[6] Presumably the court was alluding to the August 22, 2003 order expressly confirming the arbitrator's appointment of respondent as receiver and to the October 22, 2003 order confirming respondent's authorization to pursue the instant litigation against Fire.

injustice not only to respondent but to the insured, who by stipulating to his appointment removed herself early from the pursuit of the policy benefits and of a remedy for the damage caused by Corbett's misconduct. A major reason the statutory limits are so stringent is that the appointment of a receiver necessarily "means the taking of property by the court from one who may turn out to be the rightful owner thereof," and it may thus "strike at the very substance of a person's property rights." (*Takeba v. Superior Court* (1919) 43 Cal.App. 469, 475 [185 P. 406]; accord, *Marsch, supra,* 23 Cal.App.4th at pp. 247–248.) In this case, however, neither Sanfilippo nor Verni complained that the appointment of a receiver deprived him or her of possession or control. The rationale underlying the restrictive and cautionary application of section 564 is not applicable in these procedural circumstances.

▉ Fire attempts to overcome its untimely opposition by arguing that a void order may be challenged at any time. The order was not void, however, as the court unquestionably had fundamental jurisdiction over the parties and the subject matter before it.[7] If a trial court has personal and subject-matter jurisdiction, then an order entered in excess of that jurisdiction "remains valid but voidable." (*In re Marriage of Jackson* (2006) 136 Cal.App.4th 980, 988 [39 Cal.Rptr.3d 365]; see also *id.* at p. 989 [whether act in excess of jurisdiction and thus voidable is enforced depends in large part on "the degree of the procedural irregularity and whether the court's act violated a comprehensive statutory scheme or offended public policy"].)

Thus, even if the court exceeded its jurisdiction by ratifying and adopting the arbitrator's ruling, that error does not compel reversal. Nevertheless, the order was not unjustified in the circumstances before the court. Confirming

---

[7] As our Supreme Court has explained, "Essentially, jurisdictional errors are of two types. 'Lack of jurisdiction in its most fundamental or strict sense means an entire absence of power to hear or determine the case, an absence of authority over the subject matter or the parties.' [Citation.] When a court lacks jurisdiction in a fundamental sense, an ensuing judgment is void, and 'thus vulnerable to direct or collateral attack at any time.' [Citation.] [¶] . . . ' "[W]hen a statute authorizes [a] prescribed procedure, and the court acts contrary to the authority thus conferred, it has exceeded its jurisdiction." ' [Citation.] When a court has fundamental jurisdiction, but acts in excess of its jurisdiction, its act or judgment is merely voidable. [Citations.] That is, its act or judgment is valid until it is set aside, and a party may be precluded from setting it aside by 'principles of estoppel, disfavor of collateral attack or res judicata.' [Citation.] Errors [that] are merely in excess of jurisdiction should be challenged directly, for example by motion to vacate the judgment, or on appeal, and are generally not subject to collateral attack once the judgment is final unless 'unusual circumstances were present which prevented an earlier and more appropriate attack.' " (*People v. American Contractors Indemnity Co.* (2004) 33 Cal.4th 653, 660–661 [16 Cal.Rptr.3d 76, 93 P.3d 1020]; see also *People v. Tindall* (2000) 24 Cal.4th 767, 776 [102 Cal.Rptr.2d 533, 14 P.3d 207] [A court acts in excess of its jurisdiction when it has no power to act " 'except in a particular manner, or to give certain kinds of relief, or to act without the occurrence of certain procedural prerequisites' "].)

respondent's appointment made it a judicial one, and we cannot presume that the order was made without due consideration of the merits of the parties' joint request.

### 2. *Punitive Damages*

We reach a different conclusion regarding the viability of Fire's challenge to the punitive damages award. Fire objected to this claim multiple times in the proceedings below. In its July 2003 demurrer to the first amended complaint, Fire contended that respondent lacked standing to maintain the tort causes of action or recover punitive damages because these were "purely personal" claims that are not assignable under California law. (*Murphy v. Allstate Ins. Co.* (1976) 17 Cal.3d 937, 942 [132 Cal.Rptr. 424, 553 P.2d 584].) As to these claims the court sustained the demurrer with leave to amend, as respondent had not established that he had received the arbitrator's permission to institute the claims against Fire. (*Morand v. Superior Court* (1974) 38 Cal.App.3d 347, 352–353 [113 Cal.Rptr. 281].) The next day, October 16, 2003, the arbitrator signed an amended order nunc pro tunc, which more precisely authorized respondent to pursue the claims made against the policy at issue, "including but not limited to any suits or actions arising out of the insurance carrier's handling of such claims including but not limited to the right to institute any action for breach of contract, bad faith, negligence, fraud, concealment, or any other contract or tort cause of action and specifically including the right to recover any and all damages including but not limited to punitive damage." On October 23, 2003, the trial court confirmed "as an order of this Court" the arbitrator's clarification order.

Fire repeated its standing argument in a motion in limine to dismiss respondent as a party, a motion in limine to strike the claim for punitive damages, and its trial brief, all filed on October 28, 2005. In a posttrial motion for judgment notwithstanding the verdict, Fire again contended that respondent was not entitled to recover damages on behalf of the insured (Verni) for "purely personal tort claims." Clearly the issue of whether respondent was entitled to seek punitive damages was before the trial court and is therefore properly before us on appeal.

Respondent maintains that he had standing to sue for bad faith and fraud and to recover punitive damages because he served a function analogous to that of a bankruptcy trustee appointed by the court to take possession of the assets of the debtor. Whether respondent was permitted to assert bad faith and fraud is not an issue Fire raises on appeal, and we need not address it. As to respondent's standing to pursue the remedy of punitive damages, he relies on inapposite authority for litigation of claims existing *before* the trustee's (or here, the receiver's) appointment. (See, e.g., *Mosier v. Southern Cal.*

*Physicians Ins. Exchange* (1998) 63 Cal.App.4th 1022, 1040 [74 Cal.Rptr.2d 550] [because fraud action arose before bankruptcy petition was filed, trustee properly prosecuted action on debtor's behalf];[8] *Reichert v. General Ins. Co.* (1968) 68 Cal.2d 822, 831–832 [69 Cal.Rptr. 321, 442 P.2d 377] [plaintiff's bankruptcy trustee, not plaintiff, was proper party to assert claim for breach of contract, as claim related back to contract with insured].) In this case the claims for which punitive damages were sought arose after respondent took control of the property and was subjected to Fire's tortious conduct. In any event, it is unnecessary to decide the extent to which respondent was serving a function like that of a bankruptcy trustee, because we are convinced that respondent's judicially authorized role encompassed the pursuit of the controverted request for punitive damages.

Fire argues that respondent could not pursue punitive damages because he was the receiver not for Sanfilippo and Verni personally, but for a limited estate consisting of "only those assets that were subject to the *dispute,* i.e., the property and the insurance proceeds." As so limited, the receivership estate "could not include a punitive damage claim, which is neither 'real property' nor part of the 'insurance proceeds' that were subject to dispute, but a statutory claim requiring proof of a tort violation and malice, oppression, or fraud."

The initial appointment, as Fire observes, encompassed "any and all insurance proceeds relating to past, present or future claims for damages to the Real Property or to personal property of either property that was damaged along with the Real Property by fire or other covered event including, but not limited to, those settlement proceeds in response to claims made against [Fire]." But the subsequent clarification made in response to the sustaining of the demurrer further defined the receiver's authority to include not only the right to institute the lawsuit against Fire but also "the right to recover any and all damages *including but not limited to punitive damage*[*s*]." (Italics added.) Fire's description of the receivership estate as being limited to the physical property and insurance proceeds does not undermine the broader scope of the appointment, which conferred a more expansive authority on respondent in order to benefit the receivership estate.

Fire insists, however, that the appointment was of no legal effect because a claim for punitive damages is personal and not assignable as a matter of law. It points out that the final arbitration award in January 2004 (confirmed by the court in June 2004) referred to the litigation as having been assigned to respondent. Closer examination of the distribution approved by the court

---

[8] Contrary to respondent's description of *Mosier,* the court in that case did not hold that the trustee had standing specifically to pursue punitive damages; the court's focus instead was on the trustee's capacity to sue for fraud and conspiracy to breach a fiduciary duty.

reveals, however, that an "assignment" of a personal claim did not take place in the sense urged by Fire, and, as noted earlier, the trial court expressly found that this matter did not involve an assignment of rights. In his final award the arbitrator delineated the distribution of the funds received from sale of the property, settlement proceeds, and other sources. The arbitrator's phrase "assignment of claims against insurer" was used in the context of defining the compensation for receiver's service. The arbitrator explained that respondent had been awarded fees and costs in September 2003 "in addition to other consideration (assignment of claims against insurer and judgment against the general contractor)." By way of further explanation, the arbitrator incorporated an attached breakdown of respondent's expenses, and stated that "[a]fter the Receiver's fees and costs are paid from the funds held by the Receiver, there should be a balance available for distribution from the sale of the Property of $75,268.35." There were other assets in the receivership account, leaving $86,612.02 available for distribution.[9] The receiver was to distribute "all remaining funds, consistent with this final award, to [Sanfilippo's counsel]." And "any recovery and/or settlement in the lawsuit against [Fire] which was assigned to the Receiver, which would have otherwise been payable to Ms. Verni, shall be paid to Mr. Sanfilippo . . . ." The distribution outlined by the arbitrator and adopted by the court indicates that it was the receivership estate that was to recover damages. Whatever amount respondent was permitted to retain was in the nature of compensation, not the product of a personal assignment of an insured's legal rights. Thus, neither the facts found by the trial court nor the cases on which Fire relies support its premise that an assignment took place.

Fire notes that an earlier order by the arbitrator (which was adopted by the court) called for distribution of any recovered damages to respondent, Sanfilippo, and Verni such that respondent would receive 80 percent of any amount recovered *after* paying himself $60,000 from the cash in the receivership estate, repaying himself for his costs and attorney fees, paying himself an additional $40,000.[10] In Fire's view, this aspect of the order demonstrates that respondent is an assignee. Although it is impossible to discern from the record whether respondent was permitted *personally* to retain more than $1.4 million, as Fire represents, that question is not relevant to the issue of whether Fire's conduct made it liable for punitive damages, and Fire has correctly refrained from raising it as a separate challenge.[11] As respondent

---

[9] This amount was to be paid to Sanfilippo.

[10] The final judgment delineated the recovery as follows: $3,000 for fraud (after the $60,000 reduction for the settlement with Corbett), $93,462 for breach of insurance contract and breach of the covenant of good faith and fair dealing, $480,086.44 for attorney fees, $40,561.71 for expert fees, $38,489.44 for costs, and $1,500,000 in punitive damages.

[11] Fire also did not object below that the allocation of damages was beyond the scope of respondent's appointment as receiver, except in the context of its argument that respondent was

was not acting as an assignee and Fire does not further contest the amount awarded as excessive,[12] there is no basis for overturning this part of the judgment.

## 3. Brandt *Fees*

Respondent seeks attorney fees under *Brandt v. Superior Court* (1985) 37 Cal.3d 813 [210 Cal.Rptr. 211, 693 P.2d 796] for defending the judgment on appeal. Although his argument and citation of authority are late in coming, having been produced only a day before oral argument, Fire has not complained about untimeliness. Taking the initiative in its reply brief, Fire pointed out that the Supreme Court has not explicitly ruled on the question of whether appellate attorney fees are recoverable.

In *Brandt* our Supreme Court resolved a conflict among the Courts of Appeal by holding that an insured may recover *as damages* the attorney fees he or she has incurred to obtain the benefits due under a policy when the insurer has wrongfully refused to compensate the insured for the loss. The court emphasized that the recoverable fees "may not exceed the amount attributable to the attorney's efforts to obtain the rejected payment due on the insurance contract." (*Brandt v. Superior Court, supra,* at p. 819.) The *Brandt* holding was reaffirmed in *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 812 [16 Cal.Rptr.3d 374, 94 P.3d 513] (explaining proper method of calculating recoverable fees incurred under contingent-fee contract) and most recently in *Essex Ins. Co. v. Five Star Dye House, Inc.* (2006) 38 Cal.4th 1252 [45 Cal.Rptr.3d 362, 137 P.3d 192] (assignee of insured may recover *Brandt* fees). As the parties tacitly recognize, the Supreme Court has not expressly taken a position on the extension of *Brandt* to legal fees the insured has incurred in defending a judgment on appeal.

Fire directs our attention to two decisions, *Burnaby v. Standard Fire Ins. Co.* (1995) 40 Cal.App.4th 787 [47 Cal.Rptr.2d 326] and *Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847 [93

---

acting improperly as an assignee. In its motion in limine to preclude testimony by respondent that he was acting for the benefit of the receivership estate, Fire argued that such evidence would give the jury the false impression that Sanfilippo and Verni would be the primary beneficiaries of any recovery and that respondent would receive only an hourly fee for his time. Fire wanted the jury to hear that respondent and Sterling would be receiving 90 percent of any settlement proceeds from the litigation. But it did not argue that respondent lacked the legal capacity to retain personally 80 percent of the $1,500,000 awarded, and respondent did not have occasion to defend or explain the award on that ground.

[12] Fire did complain in its motion for a new trial that the amount awarded was grossly excessive, based on the disparity between the punitive and compensatory awards and on the amount of evidence regarding Fire's conduct and the harm caused. It does not renew this argument on appeal, however.

Cal.Rptr.2d 364], in which such fees were denied. The *Shade* court did not independently decide the question of attorney fees on appeal, but only cited *Burnaby* without analysis, denying the plaintiff's request for *Brandt* fees in a footnote. (78 Cal.App.4th at p. 909, fn. 17.) In *Burnaby,* the appellate court denied attorney fees on appeal, relying in large part on the dissenting opinion in *Brandt.* After examining the amount of damages awarded by the jury at trial, the court noted that "for all we know," the insured might have already recovered fees attributable to the attorney's efforts to recover the payment due under his policy. (*Burnaby, supra,* 40 Cal.App.4th at p. 793.) The court emphasized that *Brandt* did not specifically address the question of whether attorney fees on appeal are recoverable. It rejected the language of the disposition in *Downey Savings & Loan Assn. v. Ohio Casualty Ins. Co.* (1987) 189 Cal.App.3d 1072, 1101 [234 Cal.Rptr. 835], where the court allowed attorney fees on appeal without analysis. In the *Burnaby* court's view, "there is nothing in *Brandt* to suggest that the Supreme Court intended that an additional item of *damages* be awarded following an insured's successful effort to repel an insurer's appeal." (*Burnaby, supra,* 40 Cal.App.4th at p. 794.)

Respondent answers Fire by citing *Downey,* along with *Track Mortgage Group, Inc. v. Crusader Ins. Co.* (2002) 98 Cal.App.4th 857, 871 [120 Cal.Rptr.2d 228] and *McGregor v. Paul Revere Life Ins. Co.* (9th Cir. 2004) 369 F.3d 1099. *Track* (as Fire pointed out in oral argument) did not engage in an analysis of the recoverability of appellate attorney fees. *McGregor* was a decision by the Ninth Circuit Court of Appeals. Recognizing the conflict between *Downey* and *Track* on the one hand and *Burnaby* and *Shade* on the other, the federal court rejected the reasoning and conclusion of *Burnaby* as unpersuasive. The court concluded that if the California Supreme Court were to address the issue, it would allow the fees the insured incurred to defend the jury's verdict against the insurer's appeal. "In this case, McGregor proved bad faith to the jury, but could not obtain the benefits due her until she had successfully defended the jury's verdict against Paul Revere's appeal. Because the fees McGregor incurred on appeal were necessary to obtaining her policy benefits, the logic of *Brandt* necessarily implies that they should be recoverable." (*Id.* at p. 1101.)

██ We agree with the Ninth Circuit in *McGregor* that attorney fees the insured has incurred to defend a judgment against the insurer's appeal are a logical extension of the fees incurred in pursuing the recovery in the trial court. The collection of the benefits due is not complete when the insurer resists the judgment by challenging the judgment on appeal. Thus, to the extent that appellate attorney fees reflect the continuation of services performed to obtain the rejected payment of policy benefits, they should be recoverable under the rationale of *Brandt.*

## *Disposition*

The judgment is affirmed. Respondent is entitled to attorney fees for this appeal in an amount to be determined by the trial court, consistently with *Brandt v. Superior Court, supra*, 37 Cal.3d at pages 817–819. The parties shall otherwise bear their own costs on appeal.

Rushing, P. J., and Premo, J., concurred.