[No. F058139. Fifth Dist. July 29, 2010.]

ESSEX INSURANCE COMPANY, Cross-complainant and Appellant, v. RICHARD HECK, Cross-defendant and Respondent.

**COUNSEL**

The Zumwalt Law Firm and Frank T. Zumwalt for Cross-complainant and Appellant.

Donnelly Nelson Depolo & Murray, David A. Depolo and Sonja M. Dahl for Cross-defendant and Respondent.

**OPINION**

**GOMES, J.**—What the heck?!? At one point, the trial court commented, "This is one of the most screwed up cases I've ever seen." We heartily agree.

Essex Insurance Company provided a defense to a defendant in a personal injury action who was not its named insured, but did not discover its mistake until after judgment was entered following a jury verdict in the plaintiff's favor. Litigation ensued over Essex's obligation to pay the judgment. Essex eventually entered into a global settlement with the plaintiff that resulted in the dismissal of three lawsuits, including the personal injury action and a bad faith action plaintiff brought against Essex, in exchange for a lump sum payment. The settlement agreement did not allocate the payment among the three lawsuits or resolve issues regarding the identity of Essex's insured.

Essex then sought indemnity from Dr. Richard Heck, who had treated the plaintiff in the personal injury action, through equitable subrogation, for his proportionate liability for the amount Essex paid in settlement. Dr. Heck filed a motion for summary judgment, which the trial court granted on the basis that Essex had waived any claim for equitable subrogation. In a postjudgment order, the trial court also awarded Dr. Heck his expert witness costs. On appeal, Essex challenges both the judgment and the order. We agree with the trial court that Essex must lie in the bed it made, and affirm.

## FACTUAL AND PROCEDURAL HISTORIES

*Dompeling's Personal Injury Action*

John Dompeling was hired to move refrigeration units in a restaurant that was being refurbished. While on the premises, Dompeling stepped on a nail that was protruding through a piece of Sheetrock that other workers had left on the floor. Dompeling, a diabetic, sought treatment from his physician, Dr. Richard Heck. When the wound did not respond to outpatient treatment, Dr. Heck admitted Dompeling to the hospital. Within four days of his hospital discharge, the wound worsened. Dr. Heck readmitted Dompeling to the hospital and an orthopedic surgeon amputated Dompeling's leg below the knee. Four months later, a second amputation was required due to an infection that developed on his stump.

Dompeling filed a lawsuit for his personal injuries in April 2002, naming as defendants "Robert Abraham" and Cindy's Restaurant, which included a premises liability claim. Dompeling alleged that "Abraham" and the restaurant hired him to remove one of the refrigerators on the premises, they negligently managed, controlled and supervised the demolition being done on the premises, and they failed to take reasonable precautionary measures to protect him from a risk of harm, which caused his injuries (the personal injury action). "Robert Abraham" tendered the defense and indemnity of the personal injury action to Essex under Essex policy No. 2CC5660, which lists "Robert Lee Abraham" as the named insured. Essex agreed to defend "Robert

Lee Abraham" under a reservation of rights, but denied it had a duty to indemnify him. In a January 2003 deposition in the personal injury action, "Robert Lincoln Abraham" testified that he bought the property, and his son's name, "Robert Lee Abraham," was on the property's title.

In August 2003, "Robert Abraham" filed a cross-complaint against Dr. Heck in the personal injury action alleging causes of action for implied equitable indemnity and contribution based on Dr. Heck's alleged negligence in the medical care and treatment he provided Dompeling which contributed to Dompeling's damages. While the trial court allowed the amendment, it severed the cross-complaint from the original complaint for purposes of trial.

The trial on Dompeling's complaint took place in January 2004 and resulted in a jury verdict and judgment in favor of Dompeling and against "Robert Abraham" in the amount of $826,762.50 plus costs. The jury found "Robert Abraham" negligent in the "maintenance, use or repair" of the property and that he violated a California regulation, both of which were substantial factors in causing Dompeling harm. The jury further found Dompeling's damages totaled $1,102,350, comprised of past economic loss of $470,000, future economic loss of $175,000, and noneconomic loss of $457,350. The jury assigned responsibility for Dompeling's harm 75 percent to "Robert Abraham" and 25 percent to Dompeling. "Robert Abraham" appealed from the judgment, raising various claims of trial court error. We affirmed the judgment in an unpublished opinion. (*Dompeling v. Abraham* (Oct. 17, 2005, F045481).)

### Essex's Declaratory Relief Action

In June 2003, during the course of the personal injury action, Essex filed a declaratory relief action, entitled *Essex Ins. Co. v. Abraham* (Super. Ct. Stanislaus County, 2005, No. 333668) (the declaratory relief action), by which it sought an adjudication of the parties' respective rights, duties and obligations in the personal injury action. Essex named as defendants Robert Lee Abraham, Cindy's Restaurant and John Dompeling, and alleged it had no duty to indemnify Robert Lee Abraham or anyone else in connection with the personal injury action.

In October 2004, after judgment was entered in the personal injury action, Essex moved for leave to amend its complaint for declaratory relief to add Robert Lincoln Abraham as a defendant. For the first time, Essex asserted Robert Lincoln Abraham, not Robert Lee Abraham, was the party in the personal injury action against whom judgment was rendered and for whom it had provided a defense. Leave to amend was granted and Essex filed an amended complaint in November 2004 against both Robert Lee Abraham and

Robert Lincoln Abraham denying coverage for, and a duty to defend against, the personal injury action. In December 2004, the court entered a default judgment against Cindy's Restaurant and Robert Lee Abraham in the declaratory relief action, which stated that Essex had no duty to defend or indemnify Robert Lee Abraham or Cindy's Restaurant. In March 2005, the clerk entered default against Robert Lincoln Abraham, but a default judgment was not entered.

In April 2005, Essex filed a motion for summary judgment in its declaratory relief action, in which it asserted it was entitled to judgment as a matter of law on its declaratory relief claim because (1) Robert Lincoln Abraham was the defendant in the personal injury action and he was not insured under the policy, (2) even if Robert Lincoln Abraham was an insured, Dompeling's claims were not covered by the policy, and (3) a default judgment had already been entered against Robert Lee Abraham, the sole named insured on the policy. The motion was denied on August 12, 2005.

*Dompeling's Bad Faith Action*

After Essex refused to pay the judgment in the personal injury action, Dompeling filed a lawsuit in August 2004 against Essex, entitled *Dompeling v. Essex Ins. Co.* (Super. Ct. Stanislaus County, 2004, No. 349807) (the bad faith action), which was later consolidated with the declaratory relief action. The complaint stated causes of action for direct payment of policy benefits, bad faith, declaratory relief and breach of contract.

In a subsequent amendment to the complaint, Dompeling added as defendants Robert Lincoln Abraham, Robert Lee Abraham, and the law firm that Essex retained to represent the premises owner in the personal injury action. Dompeling also added a direct cause of action for fraud and misrepresentation against both Essex and the law firm, alleging they knew, but did not disclose, that (1) Robert Lincoln Abraham was not Robert Lee Abraham, (2) Robert Lincoln Abraham appeared and acted as Robert Lee Abraham during the personal injury action, (3) Robert Lee Abraham owned record title to the premises but Robert Lincoln Abraham purchased, managed and controlled it, (4) the person acting as Robert Lee Abraham was not the named insured under the policy but an additional insured, and (5) they would contend any judgment entered against "Robert Abraham" was entered against Robert Lincoln Abraham in a fraudulent attempt to deny coverage and their legal obligation to satisfy the judgment. In the second amended complaint, Dompeling sought attorney fees as well as punitive and exemplary damages in addition to coverage for his judgment against "Robert Abraham."

In his complaints, Dompeling specifically alleged that Essex and insurance defense counsel knowingly and fraudulently permitted Robert Lincoln Abraham to respond to discovery, participate in the defense, and attend the trial of the action as if he were Robert Lee Abraham, for the purpose of contending that any judgment entered against "Robert Abraham" would be deemed entered against Robert Lincoln Abraham, who had no coverage under the policy. Dompeling alleged these acts violated the California insurance regulations, public policy, and the rules of professional conduct for attorneys. Dompeling also alleged the fraud and misrepresentation added to the fees and costs he would incur in prosecuting the direct action against Essex due to "coverage issues" that were knowingly concealed.

### The Settlement Agreement

On October 26, 2005, a mediation was held before a retired judge. On November 9, 2005, Dompeling and Essex executed a settlement agreement. In exchange for receipt of $700,000, Dompeling released and discharged Essex, Robert Lee Abraham, Robert Lincoln Abraham, and "their respective partners, partnerships, attorneys, executives, administrators, trustees, successors, companies, affiliated companies, trusts, officers, directors, shareholders, employees, representatives, agents, insurers, reinsurers, and all of those claiming by, through or under them, of and from any and all claims, demands, actions or causes of action, known or unknown, arising out of or in any way connected with": (1) the incident involving Dompeling which occurred at the restaurant on or about May 21, 2001; (2) "the manner in which the insurance claims arising out of that incident were handled or adjusted"; and (3) "any and all claims that were, or could have been, asserted in Stanislaus County Superior Court Action Nos.: *Dompeling v. Abraham,* CV 309919 and *Dompeling v. Essex,* CV 349807 and *Essex v. Dompeling,* CV 333668." Dompeling and Essex agreed to "dismiss with prejudice all causes of action against the specified parties growing out of these claims, casualties or events," including the three superior court actions.

### Essex's Subrogation Claim

Nearly two years later, in October 2007, "Robert Abraham" filed a motion to amend his cross-complaint in the personal injury action seeking to substitute Essex in his place as the cross-complainant. While Dr. Heck opposed the motion, the trial court granted it. In November 2007, Essex served an amended cross-complaint, which named Essex as the cross-complainant and contained a single cause of action for equitable subrogation, in which Essex sought to recover from Dr. Heck the $700,000 it paid Dompeling pursuant to the settlement agreement.

Essex later filed a second amended cross-complaint, which contains a single cause of action labeled "Comparative Indemnity" and alleges: (1) "Abraham" was insured under an insurance policy with Essex; (2) Dompeling obtained a judgment against "Abraham" for all of his injuries in the sum of $826,762.50; (3) Dr. Heck is liable for his proportionate share of that judgment; (4) having paid damages to Dompeling on behalf of its insured, "Abraham," Essex is subrogated to "Abraham's" cross-claim for indemnity against Dr. Heck, as most of the amount the jury awarded was due to Dr. Heck's fault, and Essex is entitled to an award for any amount it paid in excess of the proportionate fault of its insured "Robert Abraham" after Dr. Heck's and "Abraham's" proportionate shares of liability for the judgment are determined.

### The Summary Judgment Motion

In January 2009, Dr. Heck filed a motion for summary judgment on the grounds that Essex had no right to equitable indemnity or subrogation as a matter of law for the following reasons: (1) Essex may not use subrogation to assert its own right of equitable indemnity to recover amounts it paid to settle the claims Dompeling made against it, such as the fraud, misrepresentation and bad faith claims; (2) Essex's subrogation claim fails because Essex did not compensate an insured for the same loss for which Dr. Heck is liable, since the settlement agreement states that Essex paid Dompeling $700,000 to settle all of the pending claims, including Dompeling's claims against Essex for bad faith, breach of contract, fraud and misrepresentation; (3) Essex cannot recover the amounts it paid to settle claims other than the personal injury action because any independent claim for equitable indemnity is barred by the statute of limitations; and (4) the doctrine of superior equities bars Essex's subrogation claim.

Essex opposed the motion. Essex argued it had a valid right of subrogation because (1) the insurance policy covered the loss involving Dompeling's injury and (2) it had paid the loss by satisfying Dompeling's judgment against its insured. Essex asserted Dr. Heck did not offer any admissible evidence to show that Essex paid any of the $700,000 settlement to satisfy valid claims of bad faith or fraud against Essex, such as evidence that Essex acted improperly or committed bad faith or fraud, and instead the evidence showed Essex met all of its obligations to the insured by defending him and ultimately indemnifying him for the full amount of the judgment against him. Finally, Essex asserted the statute of limitations did not bar its action, as it is one for subrogation, not an independent suit for equitable indemnity or contribution. Essex also filed objections to Dr. Heck's separate statement and evidence.

Following oral argument, the trial court took the matter under submission and later issued a written ruling. The court first noted that Dr. Heck's motion could be denied on procedural grounds with the moving documents but, after looking at the moving and opposing documents, it concluded the main legal issue in the case was clearly framed and could be addressed. The court noted the settlement agreement settles all three lawsuits for $700,000, without allocation, and is signed by a representative of Essex. The court explained that Essex can assert claims only for monies paid out on behalf of its insured, and cannot assert claims for money paid out for attorney fees in any of the three lawsuits or to settle the claims Dompeling made against it for its claims handling. The court stated that while Essex could have settled each of the three cases with separate releases, with each release setting forth the bargained-for settlement figure, it chose not to do so. Accordingly, the court ruled that Essex failed to preserve any claim it had against Dr. Heck and was barred from litigating in this action the amount it paid to settle its insured's claims versus what it paid on the other claims. The court found the doctrines of equitable subrogation or indemnification were not available to Essex, and Essex failed to preserve any proper claim it had when it entered into one settlement and release involving three different lawsuits and, by its conduct, Essex effectively waived any rights it might have had. The court also sustained Essex's objections to some of the evidence.

Judgment was subsequently entered in favor of Dr. Heck and against Essex, with Essex taking nothing by way of its cross-complaint against Dr. Heck and Dr. Heck being awarded his costs of suit.

## DISCUSSION

*Summary Judgment*

We note at the outset that the parties disagree as to the applicable standard of review. Although Dr. Heck recognizes that a trial court's decision to grant summary judgment is normally subject to de novo review on appeal, he asserts we should review the trial court's ruling for abuse of discretion because the judgment was rendered on an equitable theory.[1] We need not resolve whether the trial court here was entitled to exercise discretion in

---

[1] In *Hartford Casualty Ins. Co. v. Travelers Indemnity Co.* (2003) 110 Cal.App.4th 710, 724 [2 Cal.Rptr.3d 18] (*Hartford*), the trial court granted summary judgment in favor of the defendant after exercising its discretion in evaluating the plaintiff's and defendant's competing claims for equitable contribution, and allocating all of the defense and indemnity costs in the underlying action to the plaintiff, who was a coinsurer with the defendant. On appeal, the appellate court reviewed the ruling for abuse of discretion, stating that, " 'Summary judgment motions usually raise matters of law, but not when the trial court grants or denies such a motion on the basis of equitable determinations. [Citation.] The matter then becomes one of

determining the issues raised on the summary judgment motion or whether it was required to apply the usual standard of review by examining the evidence for material factual disputes. As we view the record, the trial court found no material factual disputes and resolved the issues on the summary judgment motion as matters of law, not as matters of judicial discretion. Accordingly, we will apply the usual de novo standard of review of summary judgment motions. Under that standard of review, we are required to view the evidence and the reasonable inferences therefrom in the light most favorable to the party opposing the summary judgment motion; doubts as to whether there are any triable issues must be resolved in favor of the opposing party; and equally conflicting evidence or inferences require denial of a summary judgment motion. (*McIntosh v. Mills* (2004) 121 Cal.App.4th 333, 338 [17 Cal.Rptr.3d 66].)

The sole cause of action in Essex's second amended cross-complaint is one for indemnity based on equitable subrogation. Essex alleges Dr. Heck is liable for his proportionate share of the $826,762.50 judgment Dompeling obtained against "Abraham" due to his medical negligence, and "[h]aving paid damages to Dompeling on behalf of its insured, Abraham," Essex is subrogated to "Abraham's cross-claim for equitable indemnity" against Dr. Heck.

■ "Equitable subrogation permits a party who has been required to satisfy a loss created by a third party's wrongful act to 'step into the shoes' of the loser and pursue recovery from the responsible wrongdoer. [Citation.] In the insurance context, the doctrine permits the paying insurer to be placed in the shoes of the insured and to pursue recovery from third parties responsible to the insured for the loss for which the insurer was liable and paid." (*Fireman's Fund Ins. Co. v. Maryland Casualty Co.* (1994) 21 Cal.App.4th 1586, 1595–1596 [26 Cal.Rptr.2d 762] (*Fireman's Fund I*).)

■ There are six elements essential to an insurer's cause of action based on equitable subrogation: " '(1) [t]he insured has suffered a loss for which the party to be charged is liable, either because the latter is a wrongdoer whose act or omission caused the loss or because he is legally responsible to the insured for the loss caused by the wrongdoer; (2) the insurer, in whole or in

---

discretion, which this court reviews under the abuse of discretion standard. [Citation.] " 'From the very nature of equity, a wide play is left to the conscience of the chancellor in formulating his decrees.' " [Citation.]' " (*Hartford, supra,* 110 Cal.App.4th at p. 724.)

The court in *Hartford,* however, did not acknowledge language in *Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61, 67–68 [99 Cal.Rptr.2d 316, 5 P.3d 874], in which our Supreme Court, without elaboration, rejected the abuse of discretion standard of review of a summary judgment based on an equitable defense, holding that the Court of Appeal erred in applying the abuse of discretion standard to review the equitable defense of laches, and that the proper standard of review was the usual de novo standard for summary judgment motions.

part, has compensated the insured for the same loss for which the party to be charged is liable; (3) the insured has an existing, assignable cause of action against the party to be charged, which action the insured could have asserted for his own benefit had he not been compensated for his loss by the insurer; (4) the insurer has suffered damages caused by the act or omission upon which the liability of the party to be charged depends; (5) justice requires that the loss should be entirely shifted from the insurer to the party to be charged . . . ; and (6) the insurer's damages are in a stated sum, usually the amount it has paid to its insured, assuming the payment was not voluntary and was reasonable.' " (*Fireman's Fund I, supra,* 21 Cal.App.4th at p. 1596.)

As pertinent here, in order to prevail on its subrogation claim, Essex must prove that it compensated its insured for the same loss for which Dr. Heck is liable. Dr. Heck's liability turns on whether he committed medical malpractice when he treated Dompeling. If he did, the loss he would be liable for is the portion of Dompeling's personal injury judgment attributable to his negligence. Since Dompeling and Essex settled the personal injury action, however, there is no longer a judgment in that case. Instead, Essex paid Dompeling $700,000 pursuant to the settlement agreement to settle not only the personal injury action, but also the declaratory relief action and the bad faith action. Thus, to prevail, Essex must prove that its settlement included payment to Dompeling for his personal injury damages on behalf of its insured (the second element), and the amount it paid (the sixth element).

As shown in both the declaratory relief and bad faith actions, disputes had arisen between Essex, Dompeling and the two Robert Abrahams regarding Essex's obligation to pay the judgment in the personal injury action. In the declaratory relief action, Essex asserted it was not obligated to pay the judgment because the judgment was against Robert Lincoln Abraham, who is not a named insured on Essex's policy. In the bad faith action, in which Dompeling named Essex, both Robert Abrahams, and insurance defense counsel as defendants, Dompeling asserted Essex and the law firm committed fraud by allowing Robert Lincoln Abraham to appear at trial in the personal injury action despite knowing he was not a named insured on the policy and did not hold record title to the property, and then contending they had no legal obligation to satisfy the judgment on the ground it was entered against Robert Lincoln Abraham. Dompeling sought damages in the bad faith action beyond the personal injury judgment, including fees and costs incurred in defending the declaratory relief action and prosecuting the bad faith action.

It is undisputed that to resolve these claims, Essex entered into a settlement agreement with Dompeling which released not only its named insured, Robert Lee Abraham, but also Robert Lincoln Abraham, Essex, and their attorneys, in exchange for a $700,000 payment to Dompeling. The settlement agreement

released all of these parties not only from claims arising from the incident that led to Dompeling's personal injuries, but also from all claims arising out of or connected with the way the insurance claims pertaining to the incident were handled and claims that were or could have been asserted in the three lawsuits—the personal injury action, Essex's declaratory relief action, and Dompeling's bad faith action. Thus, the settlement agreement encompassed more than Essex's compensation to Dompeling for his personal injuries, as it released other claims and parties. Despite this, the settlement agreement did not specify which portion of the $700,000 was paid to settle which claim, what part constituted economic or noneconomic damages, who the personal injury judgment was rendered against (either Robert Lee Abraham or Robert Lincoln Abraham), or whether that individual was an insured under the policy. Without such specifications, the agreement left unsettled into whose shoes Essex was stepping, i.e., Robert Lee Abraham's or Robert Lincoln Abraham's, and what was being paid to compensate each claim.

The settlement agreement shows that the loss Essex incurred, namely the $700,000 payment to Dompeling, is not the same loss incurred by "Robert Abraham" (against whom the judgment was rendered), as the payment was made to settle claims apart from the personal injury judgment. Because it is impossible to tell from the settlement agreement whether payment was made on behalf of an insured, what portion, if any, of the $700,000 was paid to compensate Dompeling for his personal injury claim and what portion, if any, was paid to settle the other claims, in order for Essex to prove that it compensated an insured for Dompeling's personal injury damages and the amount of such compensation, Essex necessarily must resort to evidence outside the settlement agreement.

Essex contends it can do that by producing "evidence of its intent in entering into the settlement agreement." Assuming such evidence is even admissible,[2] Dr. Heck would not be able to present his own evidence of Dompeling's and Essex's intent in entering into the settlement without resort to communications between these two parties, or their respective attorneys, that occurred during the mediation, which Essex claims are inadmissible or

---

[2] For example, Essex's unexpressed subjective intent with respect to allocation of the settlement payment is irrelevant to the proper interpretation of the settlement agreement. (See *Brant v. California Dairies, Inc.* (1935) 4 Cal.2d 128, 133 [48 P.2d 13] [absent mistake or fraud, parties' undisclosed intentions are immaterial; it is the "objective manifestations" of intent, as expressed in the contract language, that are controlling]; *Cedars-Sinai Medical Center v. Shewry* (2006) 137 Cal.App.4th 964, 980 [41 Cal.Rptr.3d 48] [" ' "[i]t is the objective intent, as evidenced by the words of the contract, rather than the subjective intent of one of the parties, that controls interpretation" ' "].)

undiscoverable confidential communications made during the mediation process,[3] or communications between Essex's employees and its attorneys regarding the settlement, which Essex claims are subject to the attorney-client privilege.[4]

Essex's failure to resolve the issue regarding the identity of its insured and to apportion the amount paid Dompeling among his various claims placed Dr. Heck in the inequitable position of having to show that Essex did not stand in its insured's shoes without access to the evidence necessary to do so. Accordingly, the trial court found Essex had impliedly waived its subrogation rights when it failed to enter into separate settlement agreements or otherwise apportion the amount paid among the three lawsuits.

Although there is apparently no case directly on point, the doctrine of implied waiver has been applied in the insurance context in *United Services Automobile Assn. v. Alaska Ins. Co.* (2001) 94 Cal.App.4th 638 [114 Cal.Rptr.2d 449] (*United Services*). There, an excess insurer sued a primary insurer for equitable indemnity and subrogation after the primary insurer entered into a settlement agreement on its insured's behalf to settle a personal injury action against the insured. The appellate court held that the excess insurer could not maintain an equitable subrogation claim against the primary insurer because the excess insurer could not show that its insured had an existing, assignable bad faith claim against the primary insurer, since the primary insurer had accepted defense of the personal injury action and settled the action within its policy limits with its insured's consent. (*United Services, supra*, 94 Cal.App.4th at p. 646.)

The appellate court concluded that "when an insured agrees to an insurer's settlement of a third party claim, the insured waives any right to maintain a bad faith action against the insurer based on the settlement, unless the insured's agreement to the settlement was procured by coercion, duress, fraud or some other improper means." (*United Services, supra*, 94 Cal.App.4th

---

[3] An extensive statutory scheme governing mediation confidentiality is set forth in Evidence Code section 1115 et seq. (*Simmons v. Ghaderi* (2008) 44 Cal.4th 570, 578 [80 Cal.Rptr.3d 83, 187 P.3d 934].) Under that scheme, oral and written communications made during the mediation process generally are not admissible or subject to discovery, subject to certain exceptions which include the agreement of all participants to disclosure. (*Id.* at pp. 578–579; Evid. Code, §§ 1119, 1122, 1124.) Here, the trial court sustained Essex's objections to the admissibility of Dr. Heck's attorney's statements in his declaration regarding the conduct of the mediation based, in part, on mediation confidentiality.

[4] As Dr. Heck's attorney explained in his declaration in support of the motion, he and his law firm had attempted to obtain discovery regarding the settlement of the underlying actions and the trial court had ordered production of documents pursuant to motions to compel, but Essex refused to turn over the documents, claiming they were subject to the attorney-client and attorney work product privileges, and filed a petition for writ of mandate with this court challenging the trial court's discovery order.

at p. 646.) The appellate court explained that "[a] finding of implied waiver under these circumstances accords with the principle that ' "California courts will find waiver when a . . . party's acts are so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished." ' (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 33–34 [44 Cal.Rptr.2d 370, 900 P.2d 619].)" (*United Services, supra,* 94 Cal.App.4th at p. 646.)

■ Applying the principle of implied waiver here, Essex's act of entering into a settlement of the three lawsuits without identifying its insured or apportioning the payment is so inconsistent with an intent to enforce its right to subrogation so as to induce a reasonable belief it had relinquished that right. While subrogation gives Essex the right to step into the shoes of its insured and assert whatever rights the insured could, since Essex never settled the issue of who its insured was nor allocated damages between Dompeling's various claims, or even between Dompeling's economic and noneconomic damages, Dr. Heck reasonably could believe Essex did not intend to seek subrogation. To conclude otherwise places Dr. Heck in the inequitable position of having to establish something that cannot be proven.

Essex contends the trial court failed to consider that the settlement agreement is subject to an inference that the $700,000 payment was intended to compensate Dompeling solely for his personal injury claim. Essex contends the following evidence creates a triable issue of fact on whether it paid money to settle anything other than the personal injury claim: (1) the amount paid pursuant to the settlement agreement was significantly less than the jury's verdict; (2) Essex did not act in bad faith in handling the claim because it provided "its insured" with a defense of the personal injury action and paid the mediated settlement before the judgment became final; and (3) Essex had not assigned any significance to the bad faith claims when it determined $700,000 should be paid to settle the entire litigation.[5]

---

[5] Essex asserts that Carl Bebber, who signed the settlement agreement for Essex, "categorically denie[d]" in his deposition that any part of the $700,000 was paid to settle a potential bad faith claim against Essex. The cited testimony, however, does not support Essex's assertion. Bebber's testimony shows only that during the handling of the premises liability action, Bebber formed his own opinion of the damages, taking into consideration liability, injury, comparative fault, lost wages, future lost wages, pain and suffering, special damages, the experts' testimony, the venue, counsel's relative strengths and weaknesses, and the potential exposure. The testimony further shows that Bebber considered all of these factors when deciding whether to make a settlement offer before trial in the premises liability action, and that he also considered these factors in determining the settlement value of the direct action on the policy, and the bad faith, fraud, and misrepresentation claims. Bebber also testified that before the mediation, he reassessed whether the premises liability action was a covered claim and was concerned it might be considered covered. None of this testimony shows that Bebber did not place any value on the claims arising from the declaratory relief and bad faith actions.

Essex's contention, however, shows why an implied waiver is applicable here—without resort to extrinsic evidence that is most likely inadmissible, it is impossible to prove how much was paid to settle each claim. Moreover, Essex ignores the other issues it failed to address in the settlement agreement apart from apportionment of the damages between the three lawsuits that shows it did not step into its insured's shoes in paying the settlement, such as the failure to identify its insured or to apportion damages between economic and noneconomic damages.

Essex asserts it clearly had an obligation to pay the judgment against "its insured." This statement, however, flies in the face of the position it took throughout the personal injury action, as well as in the ensuing declaratory relief and bad faith actions, that it was not obligated to pay such a judgment in part because it was not rendered against its insured, Robert Lee Abraham, and even if it were, policy exclusions applied that precluded coverage. Essex had even obtained a default judgment in the declaratory relief action against its named insured, Robert Lee Abraham, and the clerk had entered default against Robert Lincoln Abraham. Essex's obligation to pay the judgment is far from clear, since its named insured apparently did not appear in the personal injury action.

Essex also asserts the record contains no evidence that it engaged in any misconduct that would have subjected it to bad faith liability. Essex admits, however, the relevant issue "is whether any value was paid to settle the claims at the time of the settlement agreement, not whether there are now valid and provable claims of bad faith against Essex by Dr. Heck—who has no standing to assert such claims." Thus, by Essex's own admission, whether it actually committed misconduct is irrelevant here.

Essex contends the trial court "appears to have granted Dr. Heck's motion to penalize Essex for putting the superior court in the position of having to preside over a jury trial that would be more complicated, and involve more evidence, than the court felt was necessary." Even if the trial court was concerned with the complexities of the case and the burdens it would place on the jury, however, we review the result of the trial court's ruling, not its reasoning. (*Home Ins. Co. v. Zurich Ins. Co.* (2002) 96 Cal.App.4th 17, 22 [116 Cal.Rptr.2d 583].) Here, the result is that the trial court found Essex had waived its right to seek subrogation by entering into the settlement agreement without apportioning the damages paid between the actions. There are no triable issues of fact with respect to that finding and we agree with the trial

court that Essex has failed to preserve any claim it may have against Dr. Heck based on equitable subrogation.[6]

*The Section 998 Award to Dr. Heck*

In March 2008, Essex made a settlement demand to Dr. Heck under Code of Civil Procedure section 998 (section 998) of $857,000. In June 2008, Dr. Heck made a settlement offer to Essex under section 998, which Essex did not accept.[7] The offer was for a waiver of both costs and the right to proceed with a malicious prosecution action in exchange for dismissal of Dr. Heck with prejudice, with both sides bearing their own costs and attorney fees. After granting the summary judgment motion, the trial court awarded Dr. Heck $28,588 in expert witness fees based on section 998. On appeal, Essex contends the award must fail because the offer was not made in good faith.

██ To be valid, a section 998 offer must be made in good faith, which requires that the offer of settlement be " 'realistically reasonable under the circumstances of the particular case. . . .' " (*Jones v. Dumrichob* (1998) 63 Cal.App.4th 1258, 1262 [74 Cal.Rptr.2d 607] (*Jones*); see *Wear v. Calderon* (1981) 121 Cal.App.3d 818, 821 [175 Cal.Rptr. 566] (*Wear*).) A token or nominal offer made with no reasonable prospect of acceptance will not pass the good faith test. (*Jones, supra,* 63 Cal.App.4th at p. 1262.) "[W]hen a party obtains a judgment more favorable than its pretrial offer, [the offer] is presumed to have been reasonable and the opposing party bears the burden of showing otherwise." (*Thompson v. Miller* (2003) 112 Cal.App.4th 327, 338–339 [4 Cal.Rptr.3d 905]; accord, *Hartline v. Kaiser Foundation Hospitals* (2005) 132 Cal.App.4th 458, 471 [33 Cal.Rptr.3d 713].)

" 'Whether a section 998 offer was reasonable and made in good faith is left to the sound discretion of the trial court.' (*Nelson v. Anderson* (1999) 72 Cal.App.4th 111, 134 [84 Cal.Rptr.2d 753].) 'In reviewing an award of costs and fees under Code of Civil Procedure section 998, the appellate court will examine the circumstances of the case to determine if the trial court abused its discretion in evaluating the reasonableness of the offer or its refusal.'

---

[6] Since we conclude the trial court correctly granted summary judgment on this ground, we do not address the other grounds upon which Dr. Heck brought the motion.

[7] Essex brought its motion to tax the expert witness fees Dr. Heck was claiming as costs in part on the ground that Dr. Heck never served Essex with a section 998 offer to compromise. After Dr. Heck brought his section 998 offer to the court's attention in his opposition to the motion, Essex's attorney stated in a declaration submitted with Essex's reply that he viewed Dr. Heck's offer as having been made in retaliation for Essex's section 998 offer for the full amount of the personal injury judgment, and because the offer was so disingenuous and made no impression on him, its existence completely slipped his mind when he drafted the motion to tax costs.

(*Carver v. Chevron U.S.A., Inc.* (2002) 97 Cal.App.4th 132, 152 [118 Cal.Rptr.2d 569].) ' " [']The burden is on the party complaining to establish an abuse of discretion, and unless a clear case of abuse is shown and unless there has been a miscarriage of justice a reviewing court will not substitute its opinion and thereby divest the trial court of its discretionary power.' [Citations.]" ' (*Nelson v. Anderson*, at p. 136.)" (*Clark v. Optical Coating Laboratory, Inc.* (2008) 165 Cal.App.4th 150, 185–186 [80 Cal.Rptr.3d 812].)

■ Essex failed to satisfy its burden of demonstrating a clear abuse of discretion in this case. Essex first asserts the section 998 offer was presumptively unreasonable because it was a "less than nominal 'no money' offer." The case he cites, *Colbaugh v. Hartline* (1994) 29 Cal.App.4th 1516, 1527 [35 Cal.Rptr.2d 213], does not establish a presumption of unreasonableness where a net monetary sum is not included in a pretrial statutory settlement offer. Instead, a " 'modest settlement offer' may be in good faith if it is believed the defendant has a significant likelihood of prevailing at trial." (*Jones, supra,* 63 Cal.App.4th at p. 1264.) A defendant's offer to waive costs may carry significant value to the plaintiff because, if accepted, it eliminates the plaintiff's exposure to expert witness costs. (*Ibid.*) Here, since Dr. Heck prevailed on the summary judgment motion, Dr. Heck's offer is presumptively reasonable and the burden is on Essex to prove an abuse of discretion.

Essex's reliance on *Pineda v. Los Angeles Turf Club, Inc.* (1980) 112 Cal.App.3d 53 [169 Cal.Rptr. 66] (*Pineda*) and *Wear, supra,* 121 Cal.App.3d 818, is misplaced. In *Pineda,* the court concluded that the defendant's $2,500 section 998 offer was not a realistic effort to compromise a wrongful death action seeking $10 million in damages. (*Pineda, supra,* at p. 63.) In *Wear,* the court found that the defendant's $1 settlement offer did not satisfy the good faith requirement. (*Wear, supra,* at p. 822.) The Court of Appeal in *Jones,* in upholding the trial court's award of expert costs in a medical malpractice case in which the section 998 offer encompassed only a waiver of costs, distinguished *Pineda* and *Wear* as follows: "Appellants' reliance on *Wear* and *Pineda* is misplaced since both are factually distinguishable. In *Wear,* the record supported a conclusion that the $1 offer was made solely to enable defendant to recover expert expenses, and not because it was realistically related to its potential liability. Plaintiff in *Wear* recovered $18,500 against other defendants, indicating his claim manifestly had merit. [Citation.] In *Pineda,* the court determined that the exposure to defendant was 'enormous' despite liability being 'tenuous.' [Citation.] Unlike the record in these cases, appellants offer nothing more than the blithe assertion that the cases are analogous, stating that respondent made a similarly 'unrealistic and unreasonable' offer solely in order to 'gain a strategic advantage.' " (*Jones, supra,* 63 Cal.App.4th at p. 1263.)

 Essex points to its $857,000 settlement demand made only three months before Dr. Heck's offer to waive costs, and the jury's verdict in that amount, as evidence that Dr. Heck's offer was not a good faith attempt to settle. Whether an offer to compromise is made in good faith, however, cannot be measured by the amount of claimed damages or a party's subjective belief in the case's value. An offer to compromise may be "realistically reasonable" and justify cost shifting even though the party receiving the offer is unlikely to accept it as a consequence of the party's skewed valuation of the case. Here, Essex recovered nothing from Dr. Heck. Dr. Heck's offer is presumed reasonable and it is Essex's burden to show otherwise.

Essex next contends the offer was unreasonable because it did not know any facts that would have justified its acceptance of Dr. Heck's offer when it was made, since his malpractice liability was clear. But Dr. Heck had been contending since Essex sought to assert a subrogation claim in November 2007 that Essex could not maintain such a claim because the settlement agreement encompassed claims other than Dr. Heck's liability for Dompeling's injuries, including the discovery of the two Robert Abrahams, and the ensuing confusion and litigation over that, and whether Essex had a legal obligation to pay on behalf of either Robert Abraham given the default judgment against the only named insured under the policy. Dr. Heck also contended that the settlement agreement could not be used to show that Essex had a right of subrogation because the agreement did not show that Essex paid money for any specific reason. During argument on Essex's motion to amend the cross-complaint, the trial court noted Dr. Heck's position as "this case is so screwed up in its original form, that you're out of court." While the trial court ultimately decided Essex could not maintain its subrogation claim based on a theory of waiver, which was not specifically raised in Dr. Heck's motion, the facts underlying that theory and Dr. Heck's argument were the same, i.e., that the settlement agreement precluded Essex from bringing a subrogation claim.

In short, Essex was well aware that Dr. Heck was contending that its settlement of the three lawsuits precluded it from maintaining a subrogation action. Essex complains that Dr. Heck offered no evidence during the hearing on its motion to tax costs to show the offer was reasonable when made. It was Essex's burden, however, to show unreasonableness. It failed to do so. Accordingly, we conclude the trial court did not abuse its discretion in awarding expert witness fees under section 998 as a discretionary cost item.

## DISPOSITION

The judgment is affirmed. Costs on appeal are awarded to Dr. Heck.

Wiseman, Acting P. J., and Hill, J., concurred.