Filed 9/30/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| JAMSHID NAJAH et al., | B241097 c/w B245960 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC414185) |
| v. | |
| SCOTTSDALE INSURANCE COMPANY, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Ramona G. See, Judge. Affirmed.

Cummins & White, Larry M. Arnold, Melody S. Mosley; Law Office of Susan K. Pintar and Susan K. Pintar for Plaintiffs and Appellants.

Selman Breitman, Alan B. Yuter and Rachel E. Hobbs for Defendant and Respondent.

Appellants Jamshid Najah and Mark Akhavain sold a commercial property, taking back as partial payment a promissory note secured by a second deed of trust. When the borrower fell into default and the holder of the first deed of trust commenced foreclosure proceedings, appellants purchased from the senior lender the promissory note secured by the first deed of trust and took assignment of that trust deed. Appellants then instituted foreclosure proceedings on the second trust deed and reacquired the property by making a bid equal to the unpaid debt securing the second, including interest, costs, fees, and other expenses of foreclosure. The primary issue on appeal is whether appellants can pursue a claim for preforeclosure damage to the property deliberately caused by the purchaser under an insurance policy issued by respondent Scottsdale Insurance Company (Scottsdale) containing a mortgagee coverage provision. We conclude that appellants' full credit bid at the foreclosure sale under the second deed of trust precluded appellants from making a claim on the insurance proceeds.[1] Appellants further contend that the trial court abused its discretion in finding that a defense offer to compromise under Code of Civil Procedure section 998 was reasonable. We conclude that the court did not abuse its discretion in making this finding. We therefore affirm the judgment of the trial court.

---

[1] Because we conclude liability is precluded by appellants' full credit bid, we do not address other issues raised in the briefs, including whether the insurance at issue covered damage intentionally caused by the purchaser as "vandalism."

A. *Background Facts*

1. *The Loans*

In 2006, appellants sold a Riverside, California property to Orange Crest Realty Corporation (Orange Crest), whose principal was Ronald Shade.[2] Orange Crest borrowed $2.021 million from the Lantzman Family Trust (Lantzman Trust), in return for a promissory note secured by a first deed of trust on the property.[3] Appellants took back a promissory note and a second deed of trust for an additional $2.55 million.

There was a structure located on the property at the time of the sale.[4] Although Shade's professed intention was to demolish the building and develop the property for other uses, the $2.55 million promissory note payable to appellants stated, "[Orange Crest] will do no remodeling or construction on the property secured by this Note until the [Lantzman Trust] loan and this Note are paid in full." The second deed of trust securing the $2.55 million note similarly required Orange Crest to "keep [the] property in good condition and repair, not to remove or

_____

[2]    Appellants purchased the property in 2004 for $1.8 million.

[3]    In California, a real property loan generally involves two documents, a promissory note and a security instrument known as a deed of trust. (*Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1235 (*Alliance Mortgage*).) In a deed of trust, the lender/creditor is the "beneficiary," the borrower/debtor is the "trustor," and the independent third party empowered to conduct a foreclosure sale is the "trustee." (*Id.* at p. 1235.) The creditor is also commonly referred to as the lienholder, mortgagee or mortgageholder. (See *ibid.* at p. 1235, fn. 2; *Cornelison v. Kornbluth* (1975) 15 Cal.3d 590, 599, fn. 4.) We use these terms interchangeably.

[4]    The property had once been operated as an assisted living facility, but had been vacant at least since appellants purchased it in 2004.

demolish any building thereon; [and] to complete or restore promptly and in good and workmanlike manner any building which may be constructed, damaged or destroyed thereon."[5]

2. *The Insurance*

The $2.55 million note payable to appellants provided that Orange Crest would "furnish full all risk insurance with replacement cost guarantee insuring [appellants]."[6] Orange Crest obtained a commercial general liability policy from Scottsdale, listing the Lantzman Trust and appellants as mortgageholders. The original policy, which ran from February 16 to May 16, 2006, identified itself as a "special form" policy. However, the language which described the covered "causes of loss" stated it was a "basic form" policy and that only specific items were covered, including "vandalism," but not "theft."[7] The policy defined "vandalism" as "willful and malicious damage to, or destruction of, the described property."

The policy included a provision describing Scottsdale's obligation to appellants and the Lantzman Trust as the mortgageholders: "We will pay for covered loss of or damage to buildings or structures to each mortgageholder shown

---

[5]    The first deed of trust securing the promissory note payable to the Lantzman Trust also required Orange Crest to "keep the Property in good repair" and not "commit waste or permit impairment or deterioration of the Property."

[6]    Both deeds of trust similarly required Orange Crest to "provide, maintain and deliver to [the mortgagees] fire insurance satisfactory [to] and with loss payable to [the mortgagees]."

[7]    A special form insurance policy covers all risks except those specifically *excluded*; a basic form policy covers only risks that are specifically *included*. (See *Rios v. Scottsdale Ins. Co.* (2004) 119 Cal.App.4th 1020, 1024-1027.)

4

in the Declaration in their order of precedence, as interests may appear. [¶] . . . The mortgageholder has the right to receive loss payment even if the mortgageholder has started foreclosure or similar action on the building or structure. [¶] . . . If we deny your [referring to Orange Crest's] claim because of your acts or because you have failed to comply with the terms of this Coverage Part, the mortgageholder will still have the right to receive loss payment if the mortgageholder: [¶] (1) Pays any premium due under this Coverage Part at our request if you have failed to do so; [¶] (2) Submits a signed, sworn proof of loss with 60 days after receiving notice from us of your failure to do so; and [¶] (3) Has notified us of any change in ownership, occupancy or substantial change in risk known to the mortgageholder."

The policy remained in effect until July 16, 2008, although Orange Crest stopped paying premiums in February 2008. The premiums needed to keep the policy in effect through July 16 were paid by the agent who obtained the policy for Orange Crest. Scottsdale did not request payment of insurance premiums from appellants.

### 3. *The Default, Assignment and Foreclosure*

In or about January 2008, Orange Crest ceased making payments on the loans. Shortly thereafter, the Lantzman Trust began the process of foreclosure under its first deed of trust.[8] To stop the foreclosure, in March 2008, appellants

---

[8] California's statutory scheme (Civ. Code, §§ 2924-2924k) provides the creditor/beneficiary with a "quick, inexpensive and efficient remedy" against a defaulting debtor. (*Moeller v. Lien* (1994) 25 Cal.App.4th 822, 830; accord, *Biancalana v. T.D. Service Co*. (2013) 56 Cal.4th 807, 814.) "When a debtor defaults on a secured real property loan, the lender-beneficiary may institute nonjudicial foreclosure proceedings triggering a trustee's sale of the property to

purchased the Lantzman Trust's interest in the property for the balance due on the Lantzman Trust note, approximately $1.749 million, and the Lantzman Trust assigned its first trust deed to appellants. The assignment stated that it "grant[ed], assign[ed] and transfer[red]" to appellants "all beneficial interest under [the first] Deed of Trust," including "the note or notes as therein described or referred to, the money due and to become due thereon with interest, and all right accrued or to accrue under said Deed of Trust."

In November 2008, appellants foreclosed on the second deed of trust. At the foreclosure sale, appellants acquired the property by bidding $2,878,060.25, the amount of the unpaid debt on the second promissory note, including interest, fees, and the costs of foreclosure.

### 4. *The Insurance Claim*

In February 2008, shortly after Orange Crest stopped making payments but months before the foreclosure, appellant Akhavain visited the property for the first time since the 2006 sale to Orange Crest. He observed severe damage to the building and debris everywhere. After several unsuccessful attempts to locate Shade to determine what had happened and whether Orange Crest would be able to make a balloon payment about to become due, Akhavain and Najah returned in early March to conduct a more thorough examination of the building and inventory

satisfy the obligation." (*Pacific Inland Bank v. Ainsworth* (1995) 41 Cal.App.4th 277, 280.) Third parties may appear at the sale and bid cash for the property, offering more or less than the balance due on the debt. (*Ibid.*) The mortgagee may do the same, although unlike third parties, the mortgagee is permitted to bid all or a portion of the outstanding debt instead of cash. (*Id.* at pp. 280-281; accord, *Alliance Mortgage*, *supra*, 10 Cal.4th at p. 1238.) The property goes to the highest bidder. (Civ. Code, § 2924g, subd. (a).)

of the damage. Among other things, they observed electrical wires hanging from the ceiling; broken mirrors, furniture and bathroom fixtures; damaged walls, ceilings and carpets; and interior doors removed and left lying on the floor. In addition, a number of items that had been in place and functional at the time of the sale were missing, including air conditioning and heating units, kitchen appliances and equipment, breaker panels, the main water heater, commercial laundry equipment, light poles, mailboxes, furniture, tiles and drywall.[9]

In April 2008, after purchasing the Lantzman Trust's interest, appellants filed a police report with the Riverside Police Department. In May 2008, appellants submitted a claim to Scottsdale.

B. *The Complaint*

In May 2009, six months after reacquiring the property at the foreclosure sale, appellants brought suit against Scottsdale for breach of its insurance contract and tortious breach of the implied covenant of good faith and fair dealing.[10] The operative first amended complaint (FAC) alleged that in or about February 2008, appellants discovered that damage had occurred to the property due to theft and/or vandalism and that the loss was covered by the insurance policies issued by

---

[9] During the litigation, Shade was deposed and admitted having removed the missing items. He recalled two incidents of vandalism caused by unknown parties: one involving a broken window and the other involving water damage from a broken copper pipe. Shade's deposition testimony was introduced into evidence at trial.

[10] At the time appellants filed suit, Scottsdale had not formally denied the claim. Appellants received a formal denial shortly before trial.

7

Scottsdale. According to the FAC, it would cost at least $500,000 to repair the damaged building.

The FAC asserted claims for breach of contract and tortious breach of the implied covenant of good faith and fair dealing. It asserted that Scottsdale's conduct was "malicious, oppressive or fraudulent within the meaning of . . . Civil Code [s]ection 3294," entitling appellants to punitive damages.

C. *Scottsdale's Motions for Summary Judgment and Summary Adjudication*

Scottsdale moved for summary judgment, contending (a) that appellants had extinguished the debt and any claim to insurance proceeds by acquiring the property at the foreclosure sale with a full credit bid, and (b) that the damage was not covered by the policy.[11] The court denied the motion. Scottsdale subsequently moved for summary adjudication on the issue of punitive damages. The court granted the motion, finding appellants had presented no evidence raising a triable issue of fact to support that Scottsdale had acted with malice, fraud or oppression.

D. *The Trial*

Prior to trial, Scottsdale moved to bifurcate adjudication of the insurance coverage issue from the claim for tortious breach of the covenant of good faith and fair dealing. The court granted the motion. Counsel for the parties framed five

---

[11] As explained, at a foreclosure sale under a deed of trust, anyone may bid on the property -- including, of course, the mortgageholder, who may choose to bid more or less than the amount of the debt. (*Alliance Mortgage*, *supra*, 10 Cal.4th at p. 1238.) If the mortgageholder bids "an amount equal to the unpaid principal and interest of the mortgage debt, together with the costs, fees and other expenses of the foreclosure," it is said to have made a "full credit bid." (*Cornelison v. Kornbluth*, *supra*, 15 Cal.3d at p. 606, fn. 10.)

issues for the court to determine in the first phase: (1) "Do the [appellants] have an insurable interest in the applicable Scottsdale insurance policies? If so, what is the insurable interest the [appellants] have in the Scottsdale policies?"; (2) "If it is determined that the [appellants] had an insurable interest in the applicable Scottsdale policies, which 'Causes of Loss' Form is included in the applicable Scottsdale policies -- a Basic Form or a Special Form?"; (3) "If it is determined the [appellants] had an insurable interest in the applicable Scottsdale policies, is the [appellants'] alleged loss, or any part of the alleged loss, covered under the [applicable] Scottsdale policies?"; (4) "Are [appellants] entitled to coverage [under] the Mortgageholders provisions of the Building and Personal Property Coverage Form due to the acts of Orange [Crest] Realty/Shade?"; (5) "If it is determined that the applicable policy forms use the terms 'vandalism,' what is the meaning of the term 'vandalism' as used in those policy forms?"

After hearing evidence, the court issued a written statement of decision. The court found in favor of Scottsdale on the issues of insurable interest and coverage. The court ruled that an owner cannot vandalize or steal his own property, as those terms are defined by California law, and thus any damage or removal of property by Shade on behalf of Orange Crest was not recoverable under the policy. The court further found that except for the two minor items involving a broken window and copper pipe, the damage to the building and removal of fixtures and other items was undertaken by Shade on behalf of Orange Crest. In addition, the court found that any claim appellants had to insurance proceeds as mortgagees under the second deed of trust was extinguished by their full credit bid at the foreclosure sale. With respect to their rights as the holders of the first deed of trust, the court preliminarily agreed with appellants that the Lantzman Trust had assigned its right to insurance proceeds to appellants when it assigned that deed of trust to them.

9

The court concluded, however, that appellants' full value purchase of the Lantzman Trust's first deed of trust in a private transaction extinguished the debt and any right to insurance proceeds. Judgment was entered in favor of Scottsdale. Appellants noticed an appeal.

E. *Costs*

Prior to trial, Scottsdale served an offer to settle for $30,000 under Code of Civil Procedure section 998. Appellants did not accept. After judgment was entered in Scottsdale's favor, it filed a memorandum of costs seeking a total of $86,022.84, including $41,317.55 for expert witness expenses. Appellants filed a motion to tax costs, contending they should not be required to pay the expert witness costs under section 998 because Scottsdale's offer was unrealistic and made in bad faith. Appellants pointed out that prior to submitting the offer, Scottsdale's motion for summary judgment on liability issues had been denied. Appellants also noted that none of Scottsdale's experts had testified at trial. The trial court denied the motion to tax with respect to the expert expenses, finding that Scottsdale's offer to compromise was made in good faith, and that appellants had failed to show the expenses were unreasonable or unnecessary to the conduct of the litigation. Appellants separately noticed an appeal of the costs award. The two appeals were consolidated.

10

**DISCUSSION**

A. *Appellants' Right to Recover Insurance Benefits Under the Mortgagee Insurance Provided by Scottsdale Was Foreclosed by Their Full Credit Bid at the Foreclosure Sale*

Under the full credit bid rule, when the lienholder obtains a property at a foreclosure sale by making a full credit bid -- bidding an amount equal to the unpaid debt, including interest, costs, fees, and other expenses of foreclosure -- "it is precluded for purposes of collecting its debt from later claiming that the property was actually worth less than the bid. [Citations.]" (*Alliance Mortgage*, *supra*, 10 Cal.4th at p. 1238.) After acquiring the property in this manner, the beneficiary is generally unable to pursue "'any other remedy regardless of the actual value of the property on the date of the sale.'"[12] (*Passanisi v. Merit-McBride Realtors, Inc.* (1987) 190 Cal.App.3d 1496, 1503, quoting Miller & Starr, Current Law of Cal. Real Estate (rev. ed., 1986 supp.) Deeds of Trust and Mortgages, § 3:126, p. 354, italics omitted.) "This is because the lender's only interest in the property is the repayment of the debt. [Citation.] The lender's interest having been satisfied, any other payment would result in a double recovery." (*Track Mortgage Group, In. v. Crusader Ins. Co.* (2002) 98 Cal.App.4th 857, 864 (*Track Mortgage*); accord, *Cornelison v. Kornbluth*, *supra*, 15 Cal.3d at p. 606 [full credit bid at foreclosure

---

[12] In *Alliance Mortgage*, the Supreme Court carved out an exception for fraud claims against nonborrowers who fraudulently induced a lender to make a loan, where the lender demonstrates that "its full credit bids were a proximate result of defendants' fraud, and that in the absence of such fraud it would not, in all reasonable probability, have made the bids. [Citations.]" (*Alliance Mortgage, supra,* 10 Cal.4th at pp. 1231, 1246-1247.) Here, appellants were fully aware of the state of the property when they bid at the foreclosure sale, and did not claim their bid was the result of fraud.

11

sale "establishes the value of the [liened property] as being equal to the outstanding indebtedness" and "the nonexistence of any impairment of the security"]; *Countrywide Home Loans, Inc. v. Tutungi* (1998) 66 Cal.App.4th 727, 731 ["Under the full credit bid rule, a foreclosing lender that has purchased the real property security for such a bid is precluded from pursuing further claims to recoup its debt, because the bid has established that the foreclosed security is equal in value to the debt, which therefore has been satisfied."].)  "Thus, the lender is not entitled to insurance proceeds payable for prepurchase damage to the property, prepurchase net rent proceeds, or damages for waste, because the lender's only interest in the property, the repayment of its debt, has been satisfied, and any further payment would result in a double recovery." (*Alliance Mortgage*, *supra*, at p. 1238.)

Apart from preventing double recovery, the full credit bid rule serves to protect the integrity of the foreclosure auction.  In discussing the full credit bid rule, our Supreme Court has said, "'[t]he purpose of the trustee's sale is to resolve the question of value . . . through competitive bidding . . . .'" (*Cornelison v. Kornbluth*, *supra*, 15 Cal.3d at p. 607, quoting Hetland, Cal. Real Estate Secured Transactions (Cont. Ed. Bar 1970) p. 255.)  In order to ensure that a "fair price" is obtained for the foreclosure property, it must be "sold at public sale to the highest bidder, and at least 20 days' notice of the sale must be given." (*Smith v. Allen* (1968) 68 Cal.2d 93, 96.)  These procedures guarantee that foreclosure auctions are conducted in a "fair and open manner," with the property going to the party placing the highest value on it, and that any interested member of the public has the opportunity "to participate in setting the price for the property." (*Dreyfuss v. Union Bank of California* (2000) 24 Cal.4th 400, 411.)  A lender who intends to later claim that the value of the property was impaired due to waste, fraud or insured damage, but nonetheless makes a full credit bid, interferes with that

12

process by impeding bids from third parties willing to pay some amount between the value the lender places on the property and the amount of its full credit bid. (See 4 Miller & Starr, Cal. Real Estate (3d ed. 2000) § 10:265, p. 10-1067 ["The beneficiary controls the sale, and the full-credit bid by the beneficiary discourages other bidders who may be willing to pay a substantial sum, although less than the beneficiary's bid."].) The full credit bid rule may act to limit recovery by a foreclosing lender who hopes to pursue a legal claim for injury to the property. But "[i]f there were no repercussions for making a full credit bid, lenders could manipulate the sale and discourage prospective purchasers who might have been willing to pay just under the value of the lien." (*Michelson v. Camp* (1999) 72 Cal.App.4th 955, 964.)

Appellants contend the trial court erred in concluding that the full credit bid rule precluded them from recovering insurance benefits under the Scottsdale policy. Although we do not wholly agree with the court's reasoning, for the reasons set forth below, we concur that the full credit bid rule precludes appellants' recovery.[13]

To appreciate why the full credit bid rule has this effect on the recovery of insurance proceeds, we first set forth certain basic principles governing mortgagee insurance. Under the policy at issue here, Scottsdale agreed to "pay for covered

---

[13]     "A trial court's order is affirmed if correct on any theory, even if the trial court's reasoning was not correct." (*J.B. Aguerre, Inc. v. American Guarantee & Liability Ins. Co.* (1997) 59 Cal.App.4th 6, 15-16.) The trial court reasoned that appellants' full value purchase of the promissory note from the Lantzman Trust extinguished the debt secured by the first deed of trust. The court's reasoning was incorrect. Notes and deeds of trust are transferable and assignable, and such transfer or assignment vests in the transferee/assignee all of the rights, interests of the original beneficiary. (*Strike v. Trans-West Discount Corp.* (1979) 92 Cal.App.3d 735, 744.)

loss of or damage to buildings or structures to each mortgageholder shown in the Declarations in their order of precedence, as interests may appear." The policy included a provision stating that even if Scottsdale denied a claim for "covered loss of or damage to buildings or structures" due to "[Orange Crest's] acts" or because Orange Crest "failed to comply with the terms of this Coverage Part," the "mortgageholders" would "still have the right to receive loss payment," so long as certain conditions were met.[14] This language created what has come to be known as a "standard mortgage clause." (*Home Savings of America v. Continental Insurance Co*. (2001) 87 Cal.App.4th 835, 842-848 (*Home Savings*).) The standard mortgage clause creates "'two contracts of insurance within the policy -- one with the lienholder and the insurer and the other with the insured and the insurer.'" (*Id*. at p. 842.) As a result, "'the mortgagee has an independent contract with the insurer which cannot be defeated by improper or negligent acts of the mortgagor.'" (*Id*. at p. 849, quoting 4 Couch on Insurance (3d ed. 1997) § 65.32, pp. 65-47-65-48, fn. omitted; see *Mosee v. Firemen's Insurance Co. of Newark* (1927) 87 Cal.App. 473, 476 [standard clause "operates as an independent contract of insurance between the insurer and the mortgagee, giving the latter the same protection as if he had taken out a separate policy"].) Where a standard mortgage clause is at issue, "'the policy is not avoided as to the mortgagee by the misconduct of the mortgagor, as in destroying an insured building by burning it, or by otherwise intentionally destroying an insured property.'" (*Home Savings*, *supra*, at

---

[14] The primary condition was payment of overdue premiums on request. As discussed, the insurance broker paid the overdue premiums and Scottsdale did not request payment from appellants. The other conditions required the mortgageholder to submit a signed, sworn proof of loss on demand and notify Scottsdale of any change in ownership or occupancy or substantial change in risk. Scottsdale raised no issue with respect to any of these conditions at trial.

14

p. 849, quoting 4 Couch on Insurance, *supra*, at § 65:57, p. 65-82; accord, *Zurich Ins, Co. v. Wheeler* (9th Cir. 1988) 838 F.2d 338, 341 [standard mortgage clause "is intended to provide coverage to a mortgagee innocent of the destructive acts of the mortgagor"]; *Witherow v. United American Ins. Co*. (1929) 101 Cal.App. 334, 340 [where standard mortgage clause is in effect, "[t]he [owner] may lose his right of recovery on the policy without affecting the [lender's] rights."].)

There is a trade-off for the broad coverage afforded under a standard mortgage clause.  The amount payable to the mortgagee under the policy is limited to the amount necessary to satisfy the debt, even if it is less than would be required to repair the physical damage to the property, and once the debt is satisfied, "[the lienholder] ha[s] no further claim on any insurance proceeds."  (*Washington Mutual Bank v. Jacoby* (2009) 180 Cal.App.4th 639, 646; accord, *Universal Mortgage Co. v. Prudential Ins. Co*. (9th Cir. 1986) 799 F.2d 458, 460 ["A full or partial extinguishment of a mortgage debt, whether prior or subsequent to [the [insured] loss, precludes, to the extent thereof, any recovery on a loss by the . . . mortgagee."]; *Rosenbaum v. Funcannon* (9th Cir. 1962) 308 F.2d 680, 684 ["'[F]ull or partial extinguishment of the . . . debt, whether prior subsequent to [the insured] loss [citation] or subsequent to the loss [citation], precludes to the extent thereof, any recovery by the . . . mortgagee for the plain and sole reason that the debt, itself, has been to that extent extinguished.'"].)  Because a mortgage debt is extinguished by a full credit bid, it is well established that a mortgagee who purchases an encumbered property at a foreclosure sale by making a full credit bid is not entitled to insurance proceeds payable for preforeclosure damage to the property.  (See, e.g., *Track Mortgage*, *supra*, 98 Cal.App.4th at pp. 864-867; *Washington Mutual Bank v. Jacoby*, *supra*, at p. 646; *Reynolds v. London & Lancashire Fire Ins. Co*. (1900) 128 Cal. 16, 19-20; *Caruso v. Great Western*

15

*Savings* (1991) 229 Cal.App.3d 667, 672-673; *Duarte v. Lake Gregory Land and Water Co*. (1974) 39 Cal.App.3d 101, 105; *Universal Mortgage Co. v. Prudential Ins. Co*., *supra*, at pp. 460-461; *Rosenbaum v. Funcannon*, *supra*, at p. 685; *Altus Bank. v. State Farm Fire & Casualty Co*. (C.D. Cal. 1991) 758 F.Supp. 567, 571 (*Altus Bank*).)

This rule holds true whether the party making the claim for insurance proceeds is the holder of the first trust deed or a more junior creditor. In *Caruso v. Great Western Savings*, the second trust deed holders made a full credit bid and became owners of a property damaged by soil subsidence and subject to a first deed of trust held by Great Western. The holders of the second subsequently attempted to assert a complaint in intervention in a dispute between Great Western and the prior owners over the right to allocate insurance proceeds for the damage to the land. The court held that "the rule . . . that a full credit bid at a foreclosure sale extinguishes the underlying lien . . . appl[ies] as well to a foreclosing junior lienholder as it does to a foreclosing senior lienholder." (*Caruso v. Great Western Savings, supra,* 229 Cal.App.3d at p. 674.) Neither is permitted to "satisfy in full an obligation owed to them and then reap an additional benefit by obtaining the use of insurance proceeds." (*Ibid*.) The court pointed out a simple method for lienholders to preserve their right to obtain the benefit of the mortgagee insurance: "underbid their security interest at their foreclosure sale." (*Id*. at p. 674.) If the second trust deed holders "had entered a low bid for the property, '"a deficiency balance of the debt would have remained for which [the creditors] would have had an entitlement out of the insurance policy."'" (*Id*. at p. 674; see, e.g., *Redingler v. Imperial Savings & Loan Assn.* (1975) 47 Cal.App.3d 48, 49-50 [where lender acquired fire-damaged property at foreclosure sale for less than the amount due

16

under the deed of trust, lender "was entitled to the insurance proceeds up to the amount of the indebtedness remaining after the foreclosure sale"].)

Appellants do not dispute that their full credit bid at the foreclosure sale on the second trust deed extinguished that debt. However, they contend their position is different from the creditors in the cases cited above because they were the holders of two deeds of trust securing two separate debts. They assert that they should be entitled to pursue any remedy that would have been available to a third party holding a separate trust deed. (See *Caruso v. Great Western*, *supra*, 229 Cal.App.3d 672 [plaintiffs' foreclosure on second deed of trust did not defeat right of first trust deed holder, Great Western, from collecting insurance proceeds for damage to foreclosed property].) They contend that permitting them to pursue the insurer would not have provided an unfair windfall, as they had invested a total of $4.627 million to secure the property -- the $2.878 million bid at the foreclosure sale and the $1.749 million paid to the Lantzman Trust. They propose a rule under which all liens held by the mortgageholder be aggregated to determine whether a full credit bid was made.

This position was rejected by the court in *Romo v. Stewart Title of California* (1995) 35 Cal.App.4th 1609 (*Romo*), where the holder of two deeds of trust -- a second securing an $18,470 loan and a third securing a $12,300 loan -- foreclosed under the third deed of trust, making a bid equal to the indebtedness owed on that trust deed. The lienholder subsequently attempted to pursue fraud claims against a third party in connection with the loans, claiming she had lost the $12,300 secured by the second trust deed. The court held that any attempt to recover this item of damage was barred by the full credit bid rule. (*Id*. at p. 1617.) The court explained that a lienholder who purchases a foreclosure property by entering a full credit bid "obtain[s] an asset which the law presumes to be valued at

17

the amount of the debt plus expenses." (*Ibid.*) In the context of a foreclosure on a junior lien, a full credit bid is "presumed to establish the value of the total indebtedness, since [the purchaser takes] the property subject to the [more senior] deeds of trust." (*Ibid.*) It followed that the plaintiff's full credit bid "conclusively established the value of the property as being equal to the [total] indebtedness secured by the property." (*Ibid.*) As had the court in *Caruso v. Great Western*, *supra*, 229 Cal.App.3d at pages 673 to 674, the court in *Romo* explained there was no inequity in holding the creditor to account for her full credit bid: "Had plaintiff believed the value of the property was insufficient to support both senior liens, plaintiff was not obligated to make a full credit bid. [Citation.] Had plaintiff entered a bid for $12,300 less than the amount owing to her on the $18,470 note, then plaintiff would not be precluded from recovering the $12,300 remaining due. [Citations.] By her full credit bid, however, plaintiff accepted the property as being equal to the [total] indebtedness." (*Romo*, *supra*, at pp. 1617-1618.)

As implicitly recognized in *Romo*, applying the full credit bid rule to the combined debt where the holder of multiple deeds of trust forecloses on the most junior protects the integrity of the foreclosure auction process. The court in *Altus Bank*, *supra*, 758 F.Supp. 567, explained that once a foreclosing lender who has "reason to believe that the [foreclosure] property could be acquired at a much lower price," chooses to "bid[] too high," it becomes impossible for the property to be sold for its fair value. (*Id.* at p. 570.) "The full credit bid by [the lender] cut[s]-off other offers which might have been forthcoming, for up to $1 less than the amount of the mortgage debt." (*Ibid.*) Where the property has suffered preforeclosure damage covered by mortgagee insurance, the lender should not expect "to be able to have its mortgage debt fully paid by [the insurer] without giving [the insurer] the benefit either of the mortgage or of the proceeds of a bona-

fide auction mortgage foreclosure sale." (*Id*. at p. 571.) Accordingly, if the lender pays more than it thinks the property is worth, it will be unable to recover "the difference between what it paid and what the property was worth from [the insurer]." (*Id*. at pp. 570-571.) In other words, a mortgagee cannot "bid-in property at a mortgage sale for more than it is worth and have any part of the difference between the amount paid and the true worth survive as part of an insurance claim on the mortgage debt." (*Id*. at p. 571.)

The same rationale in support of the full credit bid rule was recognized in a New York high court decision, *Whitestone Sav. & Loan Asso. v. Allstate Ins. Co.* (N.Y. 1971) 270 N.E.2d 694 (*Whitestone*). The court there stated that the rule precluding the mortgagee from claiming a property was worth less than its bid at a foreclosure sale for the purpose of recovering insurance proceeds was "eminently practical" because "the mortgagee is entitled to recover only his debt," and "[a]ny surplus value belongs to others." (*Id*. at p. 697.) "To allow the mortgagee, after effectively cutting off or discouraging lower bidders, to take the property -- and then establish that it was worth less than the bid -- encourages fraud, creates uncertainty as to the mortgagor's rights, and most unfairly deprives the sale of whatever leaven comes from other bidders. Mortgagees have the obvious opportunity to bid only so much of the debt as equals the value of the property, and if someone else wishes to bid the same or more, so much the better for every other party concerned with the property." (*Ibid*.)[15]

---

[15] Courts from multiple jurisdictions have relied on *Whitestone*'s reasoning to preclude lenders making full credit bids from pursuing insurance claims or other claims reliant on the property's value being less than the bid. (See, e.g., *Chrysler Capital Realty, Inc. v. Grella* (2d Cir. 1991) 942 F.2d 160, 163-164; *LOL Fin. Co. v. Easy Money Catfish Co.* (Miss. 2012) 842 F.Supp.2d 1019, 1021-1023; *M&I Bank, FSB v. Coughlin* (D. Ariz. 2011) 805 F.Supp.2d 858, 866; *Penn Mut. Life*

This reasoning applies regardless of whether the mortgagee holds one or multiple deeds of trust. By making a full credit bid at the foreclosure sale on their more junior lien, appellants set an effective bid price for any other party interested in acquiring the property at $4.627 million -- the total of their bid and their outstanding lien -- notwithstanding that appellants believed the property to be worth far less. In order to out-bid appellants, any other party would have had to bid an amount greater than appellants' $2.878 million credit bid, and would have taken the property subject to appellants' outstanding $1.749 million lien on the first trust deed. (See *Penziner v. West American Finance Co.* (1937) 10 Cal.2d 160, 180 [party who purchases property at foreclosure sale on junior lien acquires title subject to all senior liens].) Thus, the effect of appellants' bidding the full amount of their second lien, notwithstanding their belief that the property was worth less than the combined amount of the first and second liens, was to block other interested parties from "participat[ing] in setting the price for the property," and preventing the property from going to the party placing the highest actual value on it. (See *Dreyfuss v. Union Bank of California*, *supra*, 24 Cal.4th at p. 411.) Having thus deprived Scottsdale of the benefit of a bona-fide mortgage foreclosure auction, they cannot now reasonably contend that they are entitled to insurance

*Ins. Co. v. Cleveland Mall Assocs.* (E.D. Tenn. 1996) 916 F.Supp. 715, 717; *In re Miller* (W.D. Mich. 2011) 442 B.R. 621, 630-633; see also *Pulleyblank v. Cape* (Mich.App. 1989) 446 N.W.2d 345, 348 ["It would defy logic to allow [the lenders] to bid an inflated price on a piece of property to ensure they would not be overbid and to defeat the equity of redemption and to then claim that the 'true value' was less than half of the value of the bid."]; Rest.3d Property, Mortgages, § 4.8, com. a. ["To permit the mortgagee, after using a full credit bid to discourage third-party bidders, to take the real estate and thereafter establish that it was worth less than the mortgage obligation encourages fraud. It also creates uncertainty as to the mortgagor's rights. Most importantly, it deprives the foreclosure process of the competitive impact of third-party bidding."].)

proceeds in the amount between what they freely paid to secure the property for themselves and the amount they now claim the property to be worth.

Appellants cite *Kolodge v. Boyd* (2001) 88 Cal.App.4th 349 (*Kolodge*) in support of a contrary conclusion. The plaintiff there held three deeds of trust secured by two properties, one in the amount of $400,000, another in the amount of $80,000, and a third in the amount of $180,000.[16] After the owner defaulted on all three loans, the plaintiff held a foreclosure sale on the third deed of trust and purchased the properties with a bid of $180,000. He then pursued claims for fraud, negligence and negligent misrepresentation against the appraiser whose evaluation of the property allegedly induced him to make the loans.

*Kolodge* is not dispositive of the question raised here. There, the plaintiff had presented evidence that in bidding only the amount of the principal due on the note securing the third trust deed, he had not made a full credit bid, as the amount of the outstanding debt had increased.[17] The primary issue addressed in *Kolodge* was whether the plaintiff had reasonably relied on the appraisals supporting inflated values for the properties when he made the bid at the foreclosure sale and, if so, whether he could assert claims for negligence. (*Kolodge, supra,* 88

---

[16] The deeds of trust were not in the same position on both properties as there was a senior lien on one of the properties. However, as the presence of the senior lien is immaterial to the holding of the case or our discussion of it, we refer to the deeds of trust held by the plaintiff in *Kolodge* as the first, second, and third.

[17] The evidence indicated that the indebtedness on the note securing the third deed of trust had nearly doubled due to accrued interest, late charges, and other components of a full credit bid. (*Kolodge*, *supra*, 88 Cal.App.4th at p. 359.) Although the *Kolodge* court purported to disagree with *Romo* -- stating that whether the more senior liens were extinguished should be analyzed under the doctrine of merger rather than the full credit bid rule -- the court also declared this issue "moot" in the absence of a full credit bid. (*Kolodge*, at pp. 362-363.)

21

Cal.App.4th at pp. 363-377.) The court concluded such claims were not precluded by the full credit bid rule. (*Id.* at pp. 363, 372.) As the court in *Track Mortgage* later observed, *Kolodge* "stand[s] for nothing more than that the full credit bid rule is inapplicable where the lender is fraudulently or negligently induced to make the bid." (*Track Mortgage*, *supra*, 98 Cal.App.4th at p. 866.)

Appellants also purport to rely on the decision in *Evans v. California Trailer Court, Inc.* (1994) 28 Cal.App.4th 540 (*Evans*). In *Evans*, however, the holder of two deeds of trust securing approximately $600,000 in debt foreclosed under the more senior deed of trust by a full credit bid of approximately $300,000, leaving the $300,000 second note and deed of trust unpaid and -- as a result of the foreclosure -- wiped out. (See *R-Ranch Markets #2, Inc. v. Old Stone Bank* (1993) 16 Cal.App.4th 1323, 1327; 5 Miller & Starr, *supra*, § 11:100, p. 11-297 ["The foreclosure sale eliminates or 'wipes out' all interests that were junior in priority to the deed of trust or mortgage. . . ."].) That situation is far removed from the one before us. Because the plaintiff in *Evans* foreclosed on the more senior of the two liens he held, there was no attempt to inflate the bid price to ensure the property remained in the hands of the foreclosing lender -- and no later claim that the property was not worth the price paid. The plaintiff bid a realistic amount given his later claims, and left the door open for interested parties to acquire the property by bidding any amount that exceeded that due on his first trust deed.[18]

---

[18] Appellants also purport to rely on *Armsey v. Channel Associates, Inc.* (1986) 184 Cal.App.3d 833. That case does not assist them. It involved an all inclusive deed of trust, an uncommonly encountered security device in which a single instrument encompasses debts owed to multiple creditors. (See Miller & Starr, *supra*, § 10:26, pp. 10-120 to 10-122 [explaining how foreclosure procedures and determination of amount of credit bid differ under an all inclusive deed of trust].) The dispute in *Armsey* centered on allocation of insurance proceeds between

In short, a lender who makes a full credit bid despite believing the value of the property to be impaired subverts the integrity of the foreclosure auction at the expense of the insurer or any other party whom the lender intends to pursue through legal action postforeclosure by "depriv[ing] the foreclosure process of the competitive impact of third-party bidding." (Rest.3d Property, Mortgages, § 4.8, com. (a).) This is true whether the lender made the full credit bid reflexively or whether it did so intending to drive away competitive bids. The aggregation rule proposed by appellants would place such a lender on the same footing as the lender who made a fair bid and risked losing the property to a higher bidder.

Moreover, adopting the aggregation rule proposed by appellants would almost inevitably lead to the end of the effectiveness of the full credit bid rule. If applicability of the rule turned on total debt rather than the manner in which the property is acquired at foreclosure, it would be a simple matter for a lender to divide a single loan between two promissory notes secured by two separate deeds of trust, and, following a default, secure the property for itself by foreclosing with a full credit bid on the junior loan while still maintaining its option to pursue additional claims currently prohibited by the rule. A similar concern was expressed in *Simon v. Superior Court of Contra Costa County* (1992) 4 Cal.App.4th 63, where the court was faced with the argument that a party who held two deeds of trust and foreclosed on one, should be permitted to proceed against the borrower for the deficiency represented by the other despite the

competing parties, which the court found to be determined by the terms of the parties' own agreement and stipulation. (*Armsey*, *supra*, 184 Cal.App.3d at pp. 835-836, 839.)

prohibition contained in the anti-deficiency statute (Code Civ. Proc., § 580d):[19] "We will not sanction the creation of multiple trust deeds on the same property, securing loans represented by successive promissory notes from the same debtor, as a means of circumventing the provisions of section 580d. The elevation of the form of such a contrived procedure over its easily perceived substance would deal a mortal blow to the antideficiency legislation of this state. Assuming, arguendo, legitimate reasons do exist to divide a loan to a debtor into multiple notes thus secured, section 580d must nonetheless be viewed as controlling where, as here, the senior and junior lenders and lienors are identical and those liens are placed on the same real property." (*Simon v. Superior Court of Contra Costa County,* at pp. 77-78.) The concerns underlying the full credit bid rule are of similar importance to those underlying the anti-deficiency statute. The rule shields not only insurers, but also borrowers and third parties involved in the loan transaction, from pursuit by a lender who, despite having achieved title to the property through a full credit bid at a nonjudicial foreclosure sale, seeks additional compensation. Appellants' full credit bid established that at the time of the foreclosure sale, the property was equivalent to the value of the total debt they held. Their claim

---

[19] Under the antideficiency statute, "no deficiency judgment shall be rendered for a deficiency on a note secured by a deed of trust or mortgage on real property . . . in any case in which the real property . . . has been sold by the mortgagee or trustee under power of sale contained in the mortgage or deed of trust." (Code Civ. Proc., § 580d.) "This provision means that a lender that chooses to sell property securing a debt through private nonjudicial foreclosure cannot pursue the borrower for any deficiency resulting from the difference between the net proceeds received from the foreclosure sale and the total amount of the debt. It prohibits actions against the borrower on the note, and [does] not . . . appl[y] to actions for tort." (*Michelson v. Camp*, *supra*, 72 Cal.App.4th at pp. 962-963.)

24

against Scottsdale for preforeclosure damage was therefore precluded by the full credit bid rule.

B. *The Trial Court Did Not Abuse Its Discretion in Finding Scottsdale's Section 998 Offer to Have Been Made in Good Faith*

Code of Civil Procedure section 998, subdivision (c)(1) provides: "If an offer [of compromise] made by a defendant is not accepted and the plaintiff fails to obtain a more favorable judgment or award, the plaintiff shall not recover his or her postoffer costs and shall pay the defendant's costs from the time of the offer." Costs awardable under this subdivision include "costs of the services of expert witnesses, who are not regular employees of any party, actually incurred and reasonably necessary in either, or both, preparation for trial or arbitration, or during trial or arbitration, of the case by the defendant." (Code Civ. Proc., § 998, subd. (c)(1); see *Bates v. Presbyterian Intercommunity Hospital, Inc*. (2012) 204 Cal.App.4th 210, 220 (*Bates*), quoting *Culbertson v. R. D. Werner Co., Inc*. (1987) 190 Cal.App.3d 704, 710-711 ["'When a defendant perceives himself to be fault free and has concluded that he has a very significant likelihood of prevailing at trial, it is consistent with the legislative purpose of section 998 for the defendant to make a modest settlement offer. If the offer is refused, it is also consistent with the legislative intent for the defendant to engage the services of experts to assist him in establishing that he is not liable to the plaintiff. It is also consistent with the legislative purpose under such circumstances to require the plaintiff to reimburse the defendant for the costs thus incurred.'"].)

Section 998 is designed to encourage the settlement of lawsuits before trial. (*Regency Outdoor Advertising, Inc. v. City of Los Angeles* (2006) 39 Cal.4th 507, 528.) "Its effect is to punish the plaintiff who fails to accept a reasonable offer

25

from a defendant." (*Culbertson v. R.D. Werner Co., Inc*., *supra*, 190 Cal.App.3d at p. 711, italics omitted.)  However, "'a good faith requirement'" is read into section 998, requiring that "'the settlement offer be "realistically reasonable under the circumstances of the particular case"'" and that there be ""'some reasonable prospect of acceptance.  [Citation.]"'" (*Bates, supra*, 204 Cal.App.4th at p. 220, quoting *Adams v. Ford Motor Co*. (2011) 199 Cal.App.4th 1475, 1483.)  "'[A] party having no expectation that his offer will be accepted "will not be allowed to benefit from a no-risk offer made for the sole purpose of later recovering large expert witness fees."'" (*Ibid*.)

"'The reasonableness of a defendant's section 998 settlement offer is evaluated in light of "what the offeree knows or does not know at the time the offer is made."'" (*Bates*, *supra,*204 Cal.App.4th at p. 221, quoting *Adams v. Ford Motor Co*., *supra*, 199 Cal.App.4th at p. 1485.)  "Where the defendant obtains a judgment more favorable than its offer, '"the judgment constitutes prima facie evidence showing the offer was reasonable . . . ."'  [Citation.]" (*Bates*, at p. 221, quoting *Santantonio v. Westinghouse Broadcasting Co*. (1994) 25 Cal.App.4th 102, 117.)  "'Whether a section 998 offer was reasonable and made in good faith is left to "the sound discretion of the trial court."'" (*Ibid*. quoting *Adams v. Ford Motor Co*., *supra*, 199 Cal.App.4th at p. 1484.)  "'In reviewing an award of costs and fees under Code of Civil Procedure section 998, the appellate court will examine the circumstances of the case to determine if the trial court abused its discretion in evaluating the reasonableness of the offer or its refusal.'  [Citation.] '"[']The burden is on the party complaining to establish an abuse of discretion, and unless a clear case of abuse is shown and unless there has been a miscarriage of justice a reviewing court will not substitute its opinion and thereby divest the trial court of its discretionary power.'  [Citations.]"'  [Citation.]" (*Clark v. Optical*

26

*Coating Laboratory, Inc*. (2008) 165 Cal.App.4th 150, 185-186; accord, *Essex Ins. Co. v. Heck* (2010) 186 Cal.App.4th 1513, 1528-1529.)

Here, appellants' primary argument to support their contention that the offer to compromise was unreasonable is the evidence developed through discovery as of September 2010, when Scottsdale served its offer, indicating damage to the property necessitated repairs in excess of $500,000. However, nothing precluded the trial court from concluding that the $30,000 offer was reasonable based on the determination -- with which we agree -- that Scottsdale had no liability.

Appellants also point to the fact that Scottsdale's motion for summary judgment on liability issues had been denied a few months prior to the offer to compromise. The Supreme Court rejected a similar argument in *Regency Outdoor Advertising, Inc. v. City of Los Angeles*, *supra*, 39 Cal.4th 507, where the plaintiff sought an award for inverse condemnation, contending that trees planted by the City of Los Angeles on municipal property damaged the value of its billboards: "Throughout the proceedings below, the City pursued ultimately meritorious arguments that provided a complete defense to [plaintiff's] claims. Although, at the time of the City's offer, the superior court had denied its motion for summary judgment or, in the alternative, summary adjudication insofar as it pertained to [the] inverse condemnation claim, we disagree with [plaintiff's] opinion that this setback required the City to issue an offer more generous than the one it extended. Given [plaintiff's] assertions that the impaired visibility of its billboards cost it millions in damages, the City's offer to remove one of the trees that it had planted possessed genuine value. Moreover, the City maintained throughout the litigation, and the trial court ultimately agreed, that [plaintiff] had no compensable right warranting compensation; this lawsuit was not a mere dispute over the extent of damages. [Citation.] Under the circumstances, we conclude that by offering to

27

remove one of the trees and pay [plaintiff] $1,000, the City satisfied whatever good faith requirement may apply to a settlement offer under Code of Civil Procedure section 998." (*Id*. at p. 531; see also *People ex rel. Lockyer v. Fremont General Corp*. (2001) 89 Cal.App.4th 1260, 1270-1271.) Similarly here, although potential damages were extensive, given the reasonable possibility that liability did not exist, the trial court did not abuse its discretion in determining that Scottsdale's offer was reasonable.

## DISPOSITION

The judgment is affirmed. The order awarding costs is affirmed.

**CERTIFIED FOR PUBLICATION.**


MANELLA, J.


We concur:


EPSTEIN, P. J.


WILLHITE, J.

28